[No. 29505.   Department Two.   May 3, 1945.]

THE STATE OF WASHINGTON, *on the Relation of Peter David, Jr., et al., Respondents,* v. ERVIN F. DAILEY *et al., Appellants.*[1]

[1] Reported in 158 P. (2d) 330.

*Ervin F. Dailey* and *Fred H. Lysons,* for appellants.

*Chadwick, Chadwick & Mills* and *Stephen F. Chadwick,* for respondents.

ROBINSON, J.—This case arose out of a struggle for the control of Pine-Creek Lead, Zinc Mining Company, a corporation. It appears that, for sometime prior to September 20, 1943, the corporation had been controlled by Peter David, a majority stockholder. At an annual meeting held on that day, minority stockholders attempted to elect a member of the board of directors by employing cumulative voting, with the result that thereafter two sets of officers claimed to be in control. This resulted in great confusion in the affairs of the company. On March 10, 1944, Peter David (since deceased) and others, as relators, began this action, which is in the nature of *quo warranto.*

Many things which occurred during the period after the disputed election were gone into during the course of the trial. Sixteen witnesses testified. The record contains about three hundred pages of testimony and more than twenty documentary exhibits, consisting of corporation books, minutes of meetings, and so forth, and an unusually long analysis by the trial judge of the many questions raised. Among other assignments of error made by appellants, it is said that the court erred:

"3. In making findings and conclusions of law and in entering judgment not supported by or in keeping with the facts of the case."

Nevertheless, the question for our determination is a very narrow one. Appellants, being required by court rule to state the questions involved in their appeal, submit but one, which reads as follows:

"When an election of the directors of a corporation is had by written ballot, voting closed, ballots are counted and tabulated by appointed tellers and the result announced, can a stockholder cast additional votes without formal re-opening of election?"

Respondents agree that but one question is involved, and, on their part, state it as follows:

"When an election of directors of a corporation is being had at a stockholders' meeting and nominations have been closed and the votes are being collected by appointed tellers; and one teller advises the principal and controlling stockholders that as cumulative voting is being indulged in by other stockholders, unless he votes his proxies for himself he will be out; and such controlling stockholder votes his proxies for himself and such proxies are tabulated and announced as votes cast and are filed with the minutes as a part of the votes cast, there having been no formal motion closing the ballot and therefore no occasion to re-open the same, is the director elected by such proxy votes, properly elected? The trial court answered this question in the affirmative."

The stockholder referred to in both questions was Peter David. It is evident that the appellants stated the question in such terms as to require an answer in their favor, and that the respondents followed suit and stated it in such terms as to require an answer in their favor. However, in the body of the briefs, the contending parties arrived at an agreement as to the question involved. We quote from the reply brief of the appellants:

"Respondents in the closing paragraph of their brief accept appellants' tender of the one important issue—the question whether Peter David (majority stockholder) was elected to the board at the annual stockholders' meeting of September 20, 1943.

"This question is further narrowed to the single point of the alleged voting of proxies by Mr. David. . . .

"They contend that the proxies were voted, the record abounds with testimony that they were not voted, nor of-

fered for voting until after the balloting had been closed, and the ballots counted."

It is, therefore, obvious that we are presented with a single, factual question for our determination.

The articles of the corporation provided for a board of seven directors. At the annual meeting on September 20, 1943, eight men were nominated for these seven places. Among them were Peter David and Ervin F. Dailey, attorney for appellants in this action. Mr. Dailey did not appear in the corporate records as a stockholder, but he had purchased, and held by assignment from one who did so appear, a certificate for five hundred shares.

Mr. David appointed Mr. Dailey, Mr. Perine, and Mr. Cain as tellers. Written ballots were used, each stockholder placing on the ballot the names of the seven for whom he voted and the number of votes he cast. It appears that, if the proxies were not voted, the election would have resulted as follows: Dailey, 482,106 votes (as the result of cumulative voting); David, 305,721; and each of the other six candidates, 305,821. These six received one hundred votes more than David because Mr. Fred H. Lysons voted for all of them, but not for David, substituting Dailey in his place.

Perine, who was one of the tellers, saw Lysons make up his ballot and noted that he had scratched out the name of Peter David and voted for the other seven. He at once realized that there was a plan afoot to eliminate David. At some time or other, and it is about this that the major conflict occurs, he told David that, unless he voted his proxies, he would be left off the board. Perine testified that he told David this when he brought the ballots up to the desk, and that David at once began to get his proxies together. This took some little time, as it necessitated checking them against the stock register. In the meantime, according to Perine, he, Dailey, and Cain began to tabulate the ballots already in their possession. This version is supported by several witnesses. Mr. Dailey, however, testified that it did not occur until after the vote had been tabulated and the result announced. Then, he says, Perine

turned to Peter David, saying: "Peter, you are not elected. . . . You are low man on the ticket."

Several other witnesses testified that nothing was said about voting proxies until after the result of the election had been announced. Assuming this as an established fact, the appellants cite *State ex rel. Martin v. Chute,* 34 Minn. 135, 24 N. W. 353; *Hopkins v. City Commission of Waycross,* 160 Ga. 217, 127 S. E. 862; 3 Cook on Corporations 2126, § 609a; and several other authorities, the general tenor of which may be sufficiently illustrated by the following:

"The action of the stockholders in permitting votes to be added to the ballot, after it had been counted and announced, was wrong, as it was too late to open the ballot to receive the votes of any who had not then voted. If a ballot could be opened and stockholders permitted to vote after the result of the ballot had been announced, the door would be left wide open for designing persons to await the result of the stockholders' votes and then change it by casting their own." *Forsyth v. Brown,* 13 Pa. Co. Ct. 576, 579.

"After the votes have been counted, and the result announced, the polls cannot be reopened and additional votes received." 5 Fletcher, Cyclopedia Corporations (Perm. ed.) 79, § 2017.

We find it difficult to believe that the result of the election was officially announced at this meeting, or that the election was closed. Most, if not all, of the testimony, to the effect that the result of the election was announced, seems to relate, not to a formal announcement by the chairman or secretary of the meeting, but to a remark addressed by Perine to Peter David individually. As illustrative of this, we quote from the testimony of Mrs. Young, who was an ardent witness for the appellants:

"Q. (By Mr. Dailey) Well, what took place after the votes were cast? A. The votes were counted and the tellers were appointed, they were gathered and counted and Mr. Perine announced the votes. Q. And what did Mr. Perine say when he announced the votes, if you recall? A. He said, 'Peter, you are out. You are not elected.'"

As far as we can determine from Mr. Dailey's testimony,

that was the announcement of the result which he had in mind in arguing that the election was closed and the result officially announced. We quote:

"After the votes were tabulated Mr. Perine turned to Peter David and said, 'Peter, you are not elected. Dailey has received some 482,000 votes and he is high man. Mr. Lysons has voted 100 shares of stock to everybody but you. You have voted your own stock for yourself and the other six directors that you voted for, and you are 100 votes short, so you are low man on the ticket.'"

Mr. Dailey further testified that there was no question that he could recall about voting any proxies. Yet, Mr. Steinburger, who was in many respects a strong and willing witness for the appellants, testified as follows:

"I know that *during the count of this vote* and immediately thereafter, and it was ascertained what the result was, that there was an attempt to replace—that Mr. David attempted to place his proxies in the vote, wanted them included. And I opposed it and so did Mr. Perine." (Italics ours.)

This clearly corroborates Perine's testimony that David was attempting to vote his proxies while the votes which had already been gathered up were being counted.

■ We are of the opinion that there was no formal announcement to the meeting of the result of the election. At all events, when the meeting adjourned, no one could have known who composed the new board; for the record is replete with testimony that a dispute arose over the question as to whether or not cumulative voting was legally allowable, and it was agreed that the matter would be further canvassed at an adjourned meeting to be held on October 18th. We need not recite the evidence to this effect since it is said in appellants' brief: "The meeting was then adjourned until October 18, 1943, to determine the question of the right to vote cumulative."

In analyzing the testimony and documentary evidence, the trial court, in delivering an oral opinion at the close of the case, said, in part:

"Tellers were appointed, they picked up the ballots, added up the score, and Mr. Perine, who was one of the

tellers, then stated to Mr. David that he was low man according to the count. Mr. David then began to assemble certain other proxies which he had and made some announcement that he would vote them. Whereupon, certain of the stockholders who had been desirous of eliminating Mr. David, assuming that the rules of certain athletic contests applied to this, claimed that he was too late. The meeting was, of course, still open; and it was then adjourned to October 18 because there was a debate about whether or not cumulative voting might be permitted. No formal reopening of the balloting was made. It is beyond question that Mr. David had certain proxies, I think some thirty or forty thousand of them, shares. These were computed on a sheet and bound up with the minutes of that meeting. The exhibit number I don't know; I don't immediately recall. . . . From the standpoint of the relator here, I think I am obliged to come to this conclusion: That Mr. David was elected a director of the corporation."

At another place in his oral decision, the trial judge speaks of the meeting of October 18th as an adjourned meeting. It was quite evidently his thought that the annual election was not completed until that date.

At the October 18th meeting, at any rate, the secretary formally announced that Peter David had been elected as trustee, and that the six candidates, other than Dailey, were also elected. Dailey, it was announced, had received the highest vote of the eight candidates, but it was claimed that he was not eligible because the stock register did not show that he was a stockholder. The parties split into two groups, each claiming to be the management of the corporation and each purporting to perform corporate acts. Much in the record relates to these matters, with which we are not now concerned.

After an examination of the by-laws, the trial court held that Dailey was legally eligible and was elected, and that Peter David was also elected; but, since the six others had received exactly the same number of votes for the other five places, no other directors were elected as a result of the meetings of September 20th and October 18th.

Appellants urge, and quite properly, that, in weighing the evidence, we should keep in mind that Perine, the re-

spondents' key witness, was a son-in-law of Peter David and, therefore, somewhat partisan. But it seems quite apparent that there were no neutrals involved on either side of this controversy. The atmosphere of the meeting may well be inferred from the testimony of Mrs. Young:

"We had been preparing for this meeting, knowing the conditions that were in the company that we had been faced with and struggling with for years, and the stockholders had bought stock and paid their cash for it, we thought we should have a little show with what had been done with the Company's business. There had been things going on behind our backs that we had not been allowed to know anything about, and we thought we wanted to at least know or to have some chance to participate in the operation of the business and know what had been done. And so to do that we had to put the whole — Peter David and the outfit out. We had made up our minds that instead of doing like some of the stockholders said, they would like to take him out on the street and beat him up, I thought we lived in a civilized country and we have laws, and courts, to sustain the things we live under.

"So we all decided we would use the legal processes put at our disposal to clean up that company."

Evidently, the annual meeting of September 20, 1943, was a tense affair. Both Mrs. Young and Mr. Lysons, who cast the one hundred votes for all nominees except David, testified that there was a great deal of confusion. It is not strange that what occurred was seen in one light by one faction, and in another by the other.

The trial itself was somewhat tense. It is peculiarly a case where the trial judge's opinion should have great weight, since most of the participants in the meeting appeared and testified before him at the trial. We have not herein made an attempt to digest all the relevant evidence, but only sufficient to show what the conflict was and the general position taken by the witnesses with respect thereto. We have, however, considered all of the evidence, and it does not appear to us that it preponderates in favor of the appellants, and certainly not to the extent that would warrant us in substituting our opinion on a purely factual question for that of the trial judge.

 It is assigned that the court erred in awarding costs to the respondents. It appears that, at the very end of the trial, the attorney for the relators, addressing the court, inquired:

"Should costs be allowed to the Relator? THE COURT: Yes, sir; I think you are entitled to that. MR. DAILEY: I didn't get that. THE COURT: The matter of costs. The Relator prevailed in general."

The matter of costs in the trial court is within that court's discretion.

There were many more angles to this action than we have been required to deal with in this opinion. As we view it, the relators did prevail in general, and we think no abuse of discretion is shown.

The judgment of the trial court is in all respects affirmed.

BEALS, C. J., BLAKE, SIMPSON, and MALLERY, JJ., concur.

