Harold I. Meyerson, Referee.
The relief sought by the petitioner is for an order in the nature of a mandamus, directing the respondent and the scrutineers of election to reopen the adjourned annual and special general meetings of shareholders held on April 19, 1960, and upon such reopening, to accept as valid the proxies theretofore tendered by the petitioner to the respondent for all purposes of such meetings.
By order of the Appellate Division made and entered on the 13th day of June, 1960, this matter was remanded to Special Term for a hearing on the following issues:
“ (a) Whether or not the law of Ontario is such as to invalidate the proxies by reason of their not having been filed in accordance with the notice of meeting;
“ (b) Whether or not the proxies sought to be voted by petitioner Pappas were obtained by reason of fraudulent representations or fraudulent omissions of material facts; and for disposition of the said application after determination of the aforesaid issues ” (10 A D 2d 944).
By order of the Supreme Court, New York County, made and entered on the 14th day of June, 1960, the trial of the issues was referred to me to hear and determine.
Before entering into the discharge of my duties, I took and subscribed the statutory oath. The issues were fully tried before me on July 5, 6, 7, 28, 29 and August 2, 3 and 4,1960.
By order of the Supreme Court, New York County, made and entered on the 18th day of July, there was also referred to me for determination, a motion by the respondent to strike the petition herein because of the willful refusal of the petitioner to subscribe his deposition before trial. During the course of the trial the petitioner signed his deposition and thereupon the respondent moved to withdraw the motion. The application *573 to withdraw the motion was granted and such disposition may now be formally noted.
The respondent, Great Sweet Grass Oils Limited, is a corporation incorporated by Letters Patent dated August 18, 1943 (and amendments thereto) under the laws of the Province of Ontario, Dominion of Canada. It is a publicly held corporation. It has 5,000,000 shares of common stock issued and outstanding which is held by approximately 17,000 or 18,000 shareholders.
On March 9, 1960, notice was directed to the shareholders calling an annual meeting of shareholders on the 4th day of April, 1960, to be followed by a special general meeting. Attached to the notice of meeting was a form of proxy in favor of management. Shareholders were also solicited by two alleged stockholders’ committees, which will be referred to hereafter as the “Port” Committee and the “ Pappas ” Committee. The Port Committee is not involved in the trial of the issues before me although its proxy material was received in evidence on behalf of the petitioner. Some of the “ Port ” material offered by the petitioner had received the judicial disapproval of Judge Dimock of the United States District Court of the Southern District of New York (Willoughby v. Port, 182 F. Supp. 496). In this case we are concerned with the proxy solicitation by the Pappas Committee.
It is claimed by the Pappas Committee that it had proxies for 1,510,000 shares which it attempted to deposit with the respondent and with the scrutineers on April 19, 1960, prior to the adjourned annual meeting but that such tender was rejected. I will discuss this feature of the case more fully in connection with the law of Ontario. I will first pass on the issue of whether or not there were fraudulent representations or omissions of relevant facts in the Pappas proxy material.
It is charged by the respondent that there were three fraudulent representations and one omission as follows:
(a) The representation contained in Exhibit “ G ” that the First National Bank of Dallas had given permission to its vice-president, Mr. John Poulos, to serve on the board of directors as a nominee of the committee.
(b) The representation that negotiations were being completed to secure the services of a former member of the New York office of the Securities and Exchange Commission.
(c) The representation that bank financing was available to the committee.
(d) The failure to disclose the committee activities of one Milton J. Shuck.
*574 Probably the first question that presents itself is the composition of the Pappas Committee. It is difficult to find the answer in the record. Mr. Pappas testified that the committee was ‘1 amorphous ’ ’ and composed of himself, Mr. A, T. Chatas, Mr. Milton Shuck and Mr. I. Harris Moss. Mr. Shuck thought that the committee consisted of Pappas, Moss and Mr. Murray Gottesman. Messrs. Chatas, Moss and Gottesman failed to testify so their respective versions of the committee members is unknown. At some undetermined time Pappas became the committee. However, there is no doubt that the committee was conceived by Mr. Shuck and that he was the sole organizer of it, although Mr. Chatas was invited to serve by Mr. Pappas.
Turning now to the specific representations or omissions, the representations of bank financing may be eliminated. I do not believe that the actual language used tended to deceive and constituted no more than “ innuendo, misstatement, exaggeration and puffing ” which is allowable under the learned opinion of Mr. Justice Eder (Matter of Hoe & Co. [Cullom-Rein], 14 Misc 2d 500, affd. 285 App. Div. 927, affd. 309 N. Y. 719).
The representation to the effect that the First National Bank of Dallas had given permission to its vice-president, Mr. John Poulos, to serve on the board of directors as a nominee of Pappas cannot be so easily dismissed. The testimony is clear that Poulos required permission from the board of directors of the bank before he could serve; that he had neither received such permission nor had he been authorized by a senior officer to go on the Great Sweet Grass board. The answers to the interrogatories addressed to Mr. Poulos sustain the respondent’s position that Poulos never sought permission, never received permission and never advised Pappas that he had. In fact the answers disclose that the acceptance by Mr. Poulos was, at best, qualified until he had more material to present to the bank. I say that the acceptance was “ at best ” qualified, because Mr. Eugene McElvaney, the senior vice-president of the bank testified by deposition that Mr. Paulos told him that he had not agreed to serve. The representations of bank approval were untrue and no proof was offered by the petitioner in support of them. The representations were material in that they added to the prestige of the committee and give it an unwarranted cloak of respectability.
Equally untrue were the representations to the effect that negotiations were being completed to secure as an advisor, a former member of the New York office of the Securities and Exchange Commission. The importance of this representation cannot be underestimated because Great Sweet Grass Oils had *575 been delisted from the American Stock Exchange by order of the Securities and Exchange Commission. It was part of the campaign of the Pappas Committee to urge the necessity for an early relisting on the Exchange as being of material benefit to shareholders and the employment of a former member of the office of the Securities and Exchange Commission would indicate great activity and probability in that direction. If the committee itself was ‘‘ amorphous ’ ’, the efforts to obtain a former Securities and Exchange employee were nebulous. Mr. Shuck apparently assumed the burden of the negotiations but never had a direct contact with such former employee. Shuck testified that three former attorneys for the Securities and Exchange Commission were approached either by his lawyers or accountant. He never knew the progress or the outcome of these negotiations. The failure to call any of these former employees with whom negotiations were being completed, or to call the persons who acted as intermediaries leads to the presumption that there were no negotiations; or if there were, they were far from being completed and that the representations to shareholders were untrue.
Even more reprehensible was the failure to inform the shareholders of the activities of Mr. Shuck.
Milton J. Shuck, a small shareholder, was a former security trader who had dealt extensively in Great Sweet Grass securities. The Pappas Committee was his creation. In March of I960 he invited Mr. Pappas ’ attention to the Great Sweet Grass situation, although Pappas was not a shareholder. (Pappas did not become a shareholder until the first week in April, 1960 when he obtained a few shares.) He arranged for Mr. Moss to act as counsel (Mr. Moss was then associated with Mr. Gottesman, Shuck’s attorney). He hired Mr. Denby who supervised the preparation of proxy material. He furnished proxy material. He supplied a list of persons to whom he had sold shares and authorized the solicitation of proxies. He agreed to help with financing and in fact did incur expense and disbursed money. He made arrangements for the printing and mailing of the proxy material. He initiated some discussion with former Securities and Exchange Commission employees as previously noted. He initiated certain negotiations with Messrs. Ciglen and Black, two former officers and directors of Great Sweet Grass who were apparently soliciting on behalf of the Port Committee. During a great part of this time Mr. Shuck was under indictment by a Federal Grand Jury for the fraudulent sale of securities in interstate commerce. With respect to the indictment, the respondent who called Mr. Shuck, *576 offered in evidence a certified copy of the indictment and two newspaper accounts thereof. The offer was expressly offered for the limited purpose of showing facts that should have been disclosed to the shareholders and not for the purpose of impeaching the witness. I reserved decision with respect to this limited offer and requested that I be supplied with authorities in connection with the offer. No authority has been presented to me and I am informed that counsel have been unable to locate a precedent. Under the circumstances I shall reject these exhibits, but even without them there is sufficient evidence in the record with respect to the indictment.
As previously noted, Willoughby v. Port (182 F. Supp. 496, 499, mod. 277 F. 2d 149), involved the affairs of this very respondent although it involved the Port Committee. The general principles of law involved in that case are equally pertinent here. The learned Judge wrote: “ Those who seek the proxies of their fellow corporate shareholder assume a fiduciary obligation. In re Scheuer, Sup. Ct. N. Y. County, 59 N. Y. S. 2d 500; Wyatt v. Armstrong, Sup. Ct., N. Y. County, 186 Misc. 216, 59 N. Y. S. 2d 502. Even if the publicity here was defective only in that it did not tell the whole truth, the failure to make such a full disclosure would have been a breach of fiduciary obligation.” This obligation to shareholders is of the “highest fiduciary'relationship ” (Matter of Wyatt v. Armstrong, 186 Misc. 216, 219).
The failure to disclose Shuck’s position in the committee was almost similar to the situation in Central Foundry Co. v. Gondelman (166 F. Supp. 429, 445) where Judge Bices wrote:
“ Management urges that Gondelman’s failure to disclose his dominant position in the Committee, that (a) he was the sole organizer thereof, (b) he alone has financed its operation, (c) each of the other six members of the Committee joined at his invitation, and (d) every candidate for the office of Director on the Committee’s slate owes his nomination to him, renders the oral communications to stockholders made by the corps of proxy solicitors working on behalf of the Committee, false and misleading. * * *
‘ ‘ The omission to disclose in the oral solicitations, Gondelman’s true position, vis-a-vis the Committee, w]as purposely evolved and executed with a view to misleading the stockholders. ’ ’
Counsel for the petitioner introduced the proxy material of Management and the Port Committee upon the theory that if Mr. Pappas had a duty to disclose certain facts to the stockholders, but failed in that duty, he would be relieved if the *577 information was sent to stockholders from Management or from other sources. Judge Bicks was faced with the same argument in the Central Foundry case (supra) and disposed of it as follows at page 446: ‘ ‘ Defendants argue in their brief that the omissions were cured by Management’s own material which called attention to Gondelman’s role as the principal figure in the Committee. In so urging defendants overlook (i) that the truth or falsity of the oral statements made by the defendants’ solicitors is to be determined by reference to the statements themselves, unaided by Management’s efforts to depict the facts; surely an untrue statement made by one and so characterised by a/nother does not render the false statement true; and (ii) Management’s endeavor to disseminate the facts was naturally impeded by the false and misleading statements.” (Emphasis supplied.)
One further comment is necessary with respect to Mr. Shuck and that relates to a conversation that Mr. Cromwell, the respondent’s president, testified took place on the night of April 18, 1960 wherein Mr. Shuck told him that he (Shuck) was under investigation by the United States Attorney’s office and he did not want to get into more trouble than he was in; that he was going to have nothing further to do with the committee and Pappas would continue as the principal member. Mr. Shuck denied that such a conversation took place. Mr. Shuck first categorically denied that he had ever told Mr. Cromwell that he was being investigated by the United States Attorney, but later, although denying the conversation of April 18, 1960, admitted that a conversation of that nature had taken place sometime previously. Counsel for the petitioner have urged that this conflict in testimony raises an issue of credibility which should be resolved in favor of Mr. Shuck. I found that Shuck’s testimony was evasive and less than frank. On the other hand Mr. Cromwell was a straightforward witness. He was a former United States Ambassador to Canada and is a person of respectability. He is entitled to full credit as a witness, and any issue of credibility must be determined in his favor.
In view of all of the testimony I conclude that the proxies sought to be voted by the petitioner were obtained by reason of fraudulent representations or fraudulent omissions of material facts and should be enjoined from voting, but even if the proxies were not obtained by such representation, I have come to the conclusion that they are invalid under the law of Ontario.
*578 As previously stated, by order of the Appellate Division of June 13,1960, this matter was remanded to Special Term for a hearing on the issue of “ whether or not the law of Ontario is such as to invalidate the proxies by reason of their not having been filed in accordance with the notice of meeting ’ ’. This was one of the issues that was referred to me by Special Term to hear and determine.
My determination of this issue has been immeasurably aided by the testimony of outstanding members of the Ontario Bar. There was a basic agreement among these expert witnesses on the fundamental principles of law; their main disagreement was in the interpretation of an order of Mr. Justice Smily of the Ontario Supreme Court which I will discuss later.
The corporate law of Ontario consists of the common law as modified by statute. The statute now effective is the Corporations Act, 1953 and the amendments thereto.
There is no common-law right on the part of a member of a corporation to vote by proxy (Harben v. Phillips, 23 Ch. D. 14, 35 [Bowen, L. J.]). Nor is there an inherent or equitable right in any shareholder to vote by proxy; such right, if it exists, must be found in the contract binding the shareholders generally, that is the company’s regulations or constitution, and it then exists only in the form and subject to the limitations therein appearing (McLaren v. Thomson [1917] 2 Ch. 41, 46). The right may be conferred by statute. Insofar as the right is granted by statute, it must be strictly construed since it is in derogation of the common law.
The following sections of the Corporations Act, 1953 (L. 1953, ch. 19) and of the respondent’s by-laws are pertinent to a determination of this issue:
(a) The Corporations Act, 1953
“ 75.— (1) Every shareholder, including a corporate shareholder, entitled to vote at meetings of shareholders may by instrument in writing appoint a proxy, who need not be a shareholder, to attend and act at the meeting in the same manner, to the same extent and with the same power as if the shareholder were present at the meeting. * * *
“ (5) The directors may by resolution fix a time, not exceeding forty-eight hours, excluding Saturdays and holidays, preceding any meeting of the shareholders before which time instruments appointing proxies to be used at that meeting must be deposited with the company, and any period of time so fixed shall be specified in the notice calling the meeting. ’ ’
*579 (b) By-laws
By Article XXII (h) shareholders are granted the right to vote by proxy.
Article XXTT (i) provides in part: “Directors may from time to time make regulations regarding the form of instruments appointing proxies, the lodging of such instruments at some place or places other than that at which the meeting or adjourned meeting of shareholders is to be held, as to the time prior to the holding of any meeting of shareholders when instruments appointing proxies may be lodged with the Company in order to be valid and acted upon ”.
It may be accepted, both by statute and contract (by-law), that the shareholders of the respondent company are entitled to vote by proxy subject to the limitation that if the directors fix a time (as limited by § 75, subd. [5], of the Corporations Act) for the deposit of the proxies, that such proxies would be required to meet such limitation in order to be effective.
Turning to the specific facts which led up to this litigation I find that at a special meeting of the board of directors of Great Sweet Grass Oils Limited held on the 7th day of March, 1960, a resolution was duly passed fixing the 4th day of April, 1960 at 11:00 o’clock in the forenoon Eastern Standard Time as the time for the annual meeting of the shareholders of the company. A special general meeting of shareholders was called for 11:30 a.m. on the same day and at the same place. At the same meeting of directors it was resolved “ that one-half hour preceding the time fixed for the commencement of said Annual Meeting be and it is hereby fixed as the time by which instruments appointing proxies to be used at said meeting be and it is hereby fixed as the time by which instruments appointing proxies to be used at said meetings or either of them must be deposited with the Company; ”. It is conceded that this resolution was a valid exercise of the power conferred upon the directors by subdivision (5) of section 75 of the Corporations Act, 1953.
By notice dated March 9, 1960 the shareholders were advised of the time and place of aforesaid meetings. The notice also advised the shareholders of the time for the deposit of proxies in the following language: “instruments appointing proxies for either the said Annual Meeting or the said Special General Meeting must be deposited with the Company at least half an hour prior to the time fixed for the commencement of the said Annual Meeting.” It is conceded that this notice complied with the provisions of subdivision (5) of section 75 insofar as it had *580 to advise shareholders that the proxies in order to he used at the meeting had to be deposited by a particular time.
Prior to the 4th day of April, 1960, two of the directors of the respondent corporation sought relief from the United States District Court, Southern District of New York, in the nature of a preliminary injunction against the voting of proxies alleged to have been obtained by fraudulent representations of the Port Committee. The court granted the relief prayed for (Willoughby v. Port, 182 F. Supp. 496, supra). On appeal, the Court of Appeals for the Second Circuit affirmed the order of the District Court, but modified it to the extent of directing the plaintiffs to take all action necessary to postpone and adjourn the meetings for two weeks with a corresponding postponement and adjournment of the time for depositing proxies. (Willoughby v. Port, 277 F. 2d 149, supra.)
On April 4, 1960 the meetings of shareholders convened and adjourned for approximately two weeks. On April 5, 1960 upon motion made to the Supreme Court of Ontario an order was made by Mr. Justice Smily which ordered the calling, holding and conducting of the adjourned annual meeting of shareholders on Tuesday April 19, 1960 at the Biltmore Hotel, New York City at 11:00 o’clock in the forenoon to be followed by the adjourned special general meeting of shareholders. The order further provided that proxies ‘1 may be deposited with the company at least one half hour prior to the time fixed for the commencement of the said adjourned annual meeting.” The order also provided for notice to shareholders. On April 6, 1960 the directors met and formally set the time for the meetings as directed by the order of Mr. Justice Smily.
By notice of April 6, 1960 the shareholders were advised that the annual and special meetings of April 4 would reconvene on the 19th day of April at the Biltmore Hotel, New York City. The annual meeting to reconvene at 11:00 o ’clock in the forenoon Eastern Standard Time and the special meeting at 11:30 o’clock or immediately upon the termination or adjournment of the annual meeting. The notice also advised the shareholders, “ that pursuant to an order of the Supreme Court of Ontario, instruments appointing proxies for either the said Adjourned Annual Meeting or the said Adjourned Special General Meeting of Shareholders may be deposited with the Company at least one-half hour prior to the time fixed for the commencement of the said Adjourned Annual Meeting on April 19, 1960.” I have emphasized the word “may” both in the order and in the notice because I will discuss it later in my opinion and I wish to point out the exact context in which *581 it was used. A strict compliance with the notice would require a deposit of proxies by not later than 10:30 in the forenoon, Eastern Standard Time, on April 19, 1960.
It is undisputed that none of the proxies held by the petitioner were deposited on April 4, 1960. Giving the testimony of Mr. Pappas its greatest force, I find that although he arrived at the meeting room on the 19th of April, 1960, between 10:10 and 10:15 in the forenoon, he did not attempt to deposit the proxies prior to 10:50. The scrutineers and management refused to receive the proxies. That brings me to the heart of the issue as to whether or not under the law of Ontario the proxies were invalid by reason of their not having been filed in accordance with the notice of the meeting.
There is no doubt that the adjourned meetings of April 19, 1960 were continuations of the meetings called for April 4, 1960 (McLaren v. Thomson [1917] 2 Ch. 41, 46, supra; Scadding v. Lorant, 3 H. L. C. 418, 447). It is also clear that when a notice requires the lodgment of proxies prior to a meeting, if they are not deposited prior to the time designated, and if the meeting is adjourned, the proxies cannot be made effective by a deposit before the meeting reconvenes (McLaren v. Thomson, supra). The experts on Ontario law are in full agreement that in the absence of some additional authorization, the failure to file proxies prior to 10:30 a.m. on April 4, 1960 would have made any subsequent attempt to file ineffective. The additional authorization must therefore be found in the order of Mr. Justice Smily which we can now consider in its proper relation to the issue.
Paragraphs 1 and 2 of Mr. Justice Smily’s order respectively direct the calling of the adjourned annual meeting of shareholders and the adjourned special general meeting of shareholders in accordance with the provisions of the Corporations Act of 1953 (with the exception of any resolution passed pursuant to § 75, subd. [5]). Paragraph 3 orders that proxies ‘ ‘ may be deposited with the company at least one half hour prior to the time fixed for the commencement of the said adjourned annual meeting on the 19th day of April 1960, notwithstanding any provisions of the Corporations Act, 1953 or the letters patent, supplementary letters patent, by-laws or resolutions of the Company to the contrary.”
The expert for the petitioner interpreted the first two paragraphs of Justice Smily’s order as removing from the board of directors the right to require shareholders to deposit or the right to restrict the vote by proxy by reason of the failure to deposit, and he interpreted the third paragraph of the order *582 as merely supplying a facility or convenience for the use of those shareholders who desired to deposit their proxies. I cannot agree with this construction and feel that it can only be accepted by some unwarranted form of mental gymnastics. The order of Mr. Justice Smily must be read in its entirety. If it had been the intention of Justice Smily to relieve the shareholders from the provisions of subdivision (5) of section 75 under any and all circumstances, the third paragraph of the order would have been superfluous. It is much more reasonable to read the order in the light of the circumstances which existed at the time of the signing. At that time, the meetings of April 4, 1960 had been held and adjourned. Under Ontario law stockholders who had not theretofore deposited could no longer do so. It was therefore intended by the order to give the stockholders the same right to deposit and vote by proxy at the adjourned meetings as they had had at the original meetings. In this connection it should be noted that this extension was obtained because the Court of Appeals wanted the Port Committee to have some additional time to canvass its shareholders and obtain new proxies if the shareholders, in the light of the previous fraudulent solicitation, cared to execute new proxies. The Pappas Committee by riding on the coattails of that litigation also found itself in possession of a two-week extension although it was in default at the time of Justice Smily’s order and was rescued from that default by reason of the fact that the order extended the filing time for all shareholders who had not theretofore filed.
The word “ may ” in the opinion of Mr. Justice Smily received the attention of both experts. The petitioner’s expert interpreted it as “ permissive ” in its ordinary English usage and concluded that there was no requirement to deposit and that proxies could be voted at the meetings even if not deposited. He suggested that the shareholders as a matter of convenience might deposit without affecting the validity of such vote one way or the other. Under the circumstances of this case this interpretation is unrealistic. Up to the very moment that Justice Smily signed the order, shareholders (including the Pappas Committee) who had not deposited their proxies prior to the April 4 meetings were precluded from voting by proxy at any adjournments thereof. They needed some remedy which would permit them to be cured of their default. There is no doubt that “ may ” as used by Mr. Justice Smily was permissive but it was permissive only to the extent that it relieved shareholders then in default from the necessary compliance with subdivision (5) of section 75 of the Corporations Act and the resolution passed *583 by virtue thereof, but that relief terminated by the use of the restrictive language “ at least one half hour prior to the time fixed for the commencement ’’. I share the opinion of Mr. Robert Baldwin Fordyce Barr, of the Ontario Bar, whose testimony was impressive and whose opinion is entitled to great weight, that under the applicable Ontario law, the word ‘1 may ’ ’ permitted a deposit of proxies up to one-half hour prior to the time of the adjourned annual meeting and that proxies not deposited up to that time would be ineffective.
I have no doubt that the failure to deposit by 10:30 in the forenoon of April 19, 1960 rendered the proxies invalid under Ontario law, but if the subject was in doubt, I would decide against the petitioner because the unexplained and inexcusable failure to file on time would in my opinion, preclude the relief sought. Mr. Pappas and the committee’s attorney, Mr. Moss, were at the meeting prior to 10:30 in the forenoon as was Mr. Cromwell, the respondent’s president. Mr. Pappas testified that no effort whatever had been made to deposit the proxies prior to 10:50 a.m. Mr. Pappas first could not remember but later admitted that he heard Mr. Moss state at the meeting that the failure was due to “ pure inadvertence ”. Thus the failure of the petitioner to call Mr. Moss as a witness can lead only to the presumption that his testimony would have been harmful to the petitioner. We are not concerned here with uninformed stockholders. We are dealing with a professional committee guided by professional counsel. The committee members should have made every effort to comply with the order and notice. They should have known that under Ontario law they would be precluded from voting by proxy if they did not comply. They held themselves out to shareholders as being capable of protecting their interests. They were under the highest fiduciary duty to do so. They should not be relieved from their gross negligence; nor is there any reason in equity for such relief. As the learned Justice wrote in McLaren v. Thomson ([1917] 2 Ch. 41, 46, supra): “ There is no room for contending that an appointment of a proxy, irregularly made, is within the spirit or equity of any inchoate right so to vote existing in the shareholder; he has either complied with the terms of the contract upon which alone the right is based or he has not.” (Emphasis supplied.)
I therefore conclude that the law of Ontario is such as to invalidate proxies that have not been filed in accordance with a valid notice under subdivision (5) of section 75 of the Corporations Act, 1953 and that the order of Mr. Justice Smily did not validate such proxies which were not filed at least *584 one-half hour prior to the time set for the adjourned annual meeting.
The foregoing constitutes the decision required by section 440 of the Civil Practice Act.
The motion by the respondent at the conclusion of the case for judgment in its favor is granted. All other motions are denied with appropriate exceptions.
The stay heretofore granted may be vacated and judgment may be entered herein in favor of the respondent and against the petitioner dismissing the petition on the merits, with costs to the respondent, except with respect to the costs assumed by the respondent by stipulation entered on the record.