William A. SMITH, III, et al.

v.

Louis V. KOERBER et al.

Civ. No. 72–817.

United States District Court,
D. Maryland.

Dec. 26, 1972.

Paul Mark Sandler and Erwin Ira Ulman, Baltimore, Md., for plaintiffs.

William F. Mosner, Towson, Md., for defendants.

BLAIR, District Judge.

### MEMORANDUM OPINION

This case arises out of a contest for control of Highland Federal Savings and Loan Association (Highland) between its present management and certain dissident shareholders. The plaintiff shareholders initially filed suit in the Circuit Court for Baltimore City to have declared invalid the election of two management directors and to establish the election of seven additional directors of their choosing. Defendants then removed the case to this court. Jurisdiction is in the federal courts by way of 28 U.S.C. §§ 1331 and 1337, Highland being a federally chartered and regulated savings and loan. 12 U.S.C. § 1461 et seq. and 12 C.F.R. § 544.1 et seq. The parties are in agreement as to the essential facts.

On December 16, 1970, the board of directors of Highland authorized a proxy solicitation on behalf of management for use at subsequent annual meetings. As a result of the solicitation, Highland received 271 proxies representing 9,869 votes. By the terms of the proxy, George O. Blome, the president of Highland, had the right to vote the proxies or to substitute a person of his choosing to do the voting. On September 15, 1971, Blome submitted his resignation as president to the board of directors, though he remained a director, and on November 2, 1971 appointed in writing Dr. William Talbot to exercise the proxies standing in his name. The next annual meeting of Highland was to occur on January 19, 1972. The terms of two of Highland's directors would expire at this time, and in accordance with the procedure outlined in its by-laws, a nominating committee proposed the reelection of Dr. Talbot and the election of James D. Laudeman, Jr., Esquire, to replace James G. Thompson, who resigned at the end of his term. On January 13, 1972—six days before the scheduled annual meeting—Blome filed with Highland a document revoking Talbot's authority to vote the proxies and substituting James A. Farley, Jr. in his stead. On January 18, Highland mailed to shareholders a second solicitation of proxies, this time in favor of Talbot directly.

The annual meeting was held on January 19 as scheduled. The substitution of Farley for Talbot went unquestioned and Farley, having filed his proxy votes five days before as required by bylaw, was certified at the meeting as holding 9,869 proxies. When the time came to elect directors, only Talbot and Laudeman's names were before the meeting,

no other names having been proposed prior to the meeting, as required in the bylaws. These two candidates each received 201 votes in their favor, but 10,071 votes, including the Farley proxies, were cast against their election. Talbot, as chairman, refused to recognize negative voting and declared himself and Laudeman elected. Those casting the negative votes then moved that negative voting be permitted, but their motion was denied by the chairman. Thereafter upon proper motion which carried the meeting was adjourned to be reconvened on February 22, 1972.

In response to its proxy solicitation of January 18, Highland received and Talbot was authorized to vote 444 proxy cards representing 15,434 votes. Of these votes 5,970 were previously held by Farley and 9,469 represented new proxies. These proxies were filed for verification by Talbot five days prior to the February 22nd meeting. At the meeting on February 22nd, again chaired by Talbot, the new proxies were certified over the protests of the Farley group. Thus, at this meeting Talbot held 15,434 votes to Farley's 3,899. A proposal was made by the Farley group to increase the board of directors from seven to fifteen and to elect certain named individuals to these posts. As this was new business, it could not be voted on at this meeting under the bylaws and a motion was made by the Farley group to adjourn until March 30, where the motion could be voted on. A vote was taken and the motion failed to carry, assuming the Talbot proxies were votable. The annual meeting was then declared adjourned *sine die*.

The Farley group held its meeting on March 30 and amended the bylaws to provide for fourteen directors. Seven new directors were then elected to these positions. The Talbot group was not present or represented at the meeting, though they did receive notice it was to be held.

At a subsequent meeting on July 5, 1972, the board of directors (Talbot group) elected Laudeman as a director under its power to fill vacancies on the board. This was done as a hedge against the Farley group's contention that the election of Talbot and Laudeman was invalid. The board did not reelect Talbot, as he was an incumbent director and his term would carry over on the failure to elect a successor at the annual meeting.

Plaintiffs seek principally two things. First, since it would give them control of the organization, plaintiffs want the proxies obtained by Talbot as a result of the January 18th solicitation declared invalid and the election of seven new directors at the March 30th meeting validated. Second, plaintiffs want the election of Talbot and Laudeman set aside, due to the negative votes, as not having been elected by the majority vote required under paragraph 4 of the Highland charter. Both plaintiffs and defendants view the issue of the validity of the Talbot proxies as the crucial point in the case and the court will address it first.

The bylaws of Highland, like any other federally chartered savings and loan are strictly prescribed by federal regulations. See 12 C.F.R. § 544.5 et seq. Paragraph 14 of Highland Federal's bylaws provides for proxy voting using the following language:

> Voting at any annual or special meeting of the members may be made by proxy, it being provided that no proxies shall be voted at any meeting unless such proxies shall have been placed on file with the secretary of the association, for verification, at least five (5) days prior to the date on which such meeting shall convene.

See 12 C.F.R. § 544.6(c). In paragraph 1, it is provided that "Annual meetings of the members shall be conducted in accordance with Roberts Rules of Order." See 12 C.F.R. § 544.5(1). Plaintiffs contend that under Roberts Rules, the February 22nd meeting was a continuation of the January 19th annual meeting and under the provisions of bylaw 14, the Talbot proxies, to be voted, had to be verified five days before the January

19th meeting and could not be verified five days prior to the February 22nd meeting. Under plaintiffs' interpretation, Talbot's proxies, not having been timely filed, could not be voted and therefore plaintiffs' motion to adjourn the February 22nd meeting to March 30th was improperly defeated. Thus, plaintiffs reason, had the motion passed, the March 30th meeting would have been authorized and the action taken there in expanding the board and electing seven new directors was lawful.

To support their position, plaintiffs offered the testimony of William Evans, an attorney and acknowledged expert in parliamentary procedure and Roberts Rules of Order. The court, in admitting this testimony, did so for purposes of guidance only and is not bound by it in any respect. Evans testified that under Roberts Rules, an annual meeting is more properly referred to as a session which can consist of several meetings for the purpose of transacting a certain order of business. An annual meeting could, therefore, be adjourned to another date to be held any time before the next scheduled annual meeting. When so adjourned and reconvened, the meeting is a continuation of the earlier meeting, and for this reason no notice need be sent to shareholders. Evans stated that, in his opinion, after studying the by-laws of Highland in light of Roberts Rules, the February 22nd meeting was a continuation of the January 19th meeting, the second part of a single session, making the only valid proxies those registered five days before the January 19th meeting. The Talbot proxies, in his view, could not be voted at the February meeting for this reason and if the motion to adjourn the meeting of February 22nd to March 30th was defeated because the Talbot proxies were recognized, such defeat was improper and the motion should be considered as passed if there were enough votes on hand for it to carry.

As legal authority, plaintiffs cite Mc-Laren v. Thomson, 86 Law Journal Reports 713 (Chancery Division, 1917), and Skora v. Great Sweet Grass Oils Ltd., 30 Misc.2d 572, 205 N.Y.S.2d 98 (1960). In *McLaren*, an English case, corporate articles required that for proxies to be valid they had to be filed not less than two days before an annual meeting. The annual meeting was adjourned to a later date. The court held that proxies filed between the date of first meeting and the date to which the meeting had been adjourned on a second date were invalid and could not be voted because they had not been filed more than two days before the first date for the meeting. The court was of the opinion that an adjourned meeting was merely a continuation of the first meeting and that all proxies to be voted had to be filed in time for the first meeting. While this decision is directly on point and supports plaintiffs' contentions, the decision in *Skora* is not. The court there ruled that proxies filed for an adjourned meeting, as specifically permitted by a court order, were not timely filed because not presented within the time limits set by the court order. Thus, only *McLaren* stands as authority for plaintiffs' position. Although the court acknowledges the *McLaren* decision as authority, it is in no way controlling and for reasons to be discussed declines to follow it under the circumstances present in this case.

■■ It is clear that a shareholder can revoke proxies at any time and that this can be done by the execution of a new proxy. 12 C.F.R. § 569.2. Pope v. Whitridge, 110 Md. 468, 73 A. 281 (1909); Burleson v. Hayutin, 130 Colo. 58, 273 P.2d 124 (1954); Henn, Law of Corporations § 196 at 383 (2nd ed. 1970). In this case, the shareholders who gave Talbot their proxies in response to the January 18th solicitation revoked the proxies previously given which were under the control of Farley. Consequently, of the 9,896 proxies Farley had at the January 19th meeting, only 3,899 had not been revoked at the time of the meeting on February 22nd. The crucial question, however, is whether the proxies given to Talbot, besides revoking a part of Farley's proxies, could also be voted

at the February meeting. If they could not, Farley would have had sufficient proxies to have carried the motion to adjourn to March. On the other hand, if Talbot's proxies could be voted at the February meeting, the motion was properly defeated. The court is of the view that Talbot's proxies could be voted at the February meeting and that the motion to adjourn the meeting to March 30th to vote on expanding the board of directors was defeated.

■ The purpose of bylaw 14 and the federal regulation it mirrors is to permit the orderly recordation of proxies and not to disenfranchise shareholders desiring to vote on vital issues concerning the management of a savings and loan association. This interpretation is borne out by the language of the provision, which requires the proxies to be submitted in advance "for verification." The five-day limit is obviously for the purpose of giving the savings and loan association time to check the authenticity of the proxies. When a meeting is adjourned and there is time enough to give the association the required five days to check authenticity, there is absolutely no reason to deny a shareholder the right to vote by a new proxy at the adjourned meeting.

■ Plaintiffs urge this court to accept the strict and rigid definition of meeting put forth in *McLaren*. While in the technical parliamentary sense, an adjourned meeting may be a continuation of a prior meeting, the American authority is not to permit, as the *McLaren* court did, this fact to deny shareholder representation at an adjourned meeting merely because such representation was not present in the initial meeting. Sagness v. Farmers Co-operative Creamery Co., 67 S.D. 379, 293 N.W. 365 (1940); Doris & Friedman, Corporate Meetings, Minutes, and Resolutions (3rd ed. 1951) at 22; 5 Fletcher Cyclopedia Corporations § 2015 at 99 (1967 Rev. Vol.). This court is fully in agreement with the observation made by the court in Washington State Labor Council v.

Federated Am. Ins. Co., 78 Wash.2d 263, 474 P.2d 98, 103, when it stated:

The right of a qualified shareholder in a corporation to vote, either personally or by proxy, for the directors who are to manage the corporate affairs is a valuable and vested property right. It is one of the most important rights incident to stock ownership and should not be annulled for purely technical reasons.

■ Still another reason exists to declare the Talbot proxies votable at the February meeting. Bylaw 13 states:

Any new business to be taken up at the annual meeting, including any proposal to increase or decrease the number of directors of the association, shall be stated in writing and filed with the secretary of the association on or before thirty (30) days before the date of the annual meeting, and all business so stated, proposed and filed, shall be considered at the annual meeting, but no other proposal shall be acted upon at the annual meeting. Any member may make any other proposal at the annual meeting and the same may be discussed and considered, but unless stated in writing and filed with the secretary thirty (30) days before the meeting such proposal shall be laid over for action at an adjourned, special or regular meeting of the members taking place thirty (30) days or more thereafter. This provision shall not prevent the consideration and approval or disapproval at the annual meeting of the reports of officers and committees, but in connection with such reports no new business shall be acted upon at such annual meeting unless stated and filed as herein provided.

The obvious reason thirty days written advance notice is required is to make certain that the proposal will be brought to the attention of interested parties who may be affected. This bylaw is identical to that authorized by federal regulation and is clearly for the purpose of avoiding major changes in the conduct of the affairs of a savings and loan association,

including the composition of the board of directors, without due notice to and an opportunity to act by its shareholders. If notice is given thirty days before the annual meeting, shareholders may intelligently record their position on the issue by voting in person or by proxy. Similarly, if the proposal is made as new business, shareholders should also be permitted to give a proxy on the issue. Plaintiffs would have the court rule that bylaw 14 prevents shareholders from expressing their preference when a motion to increase the board is raised for the first time at the annual meeting. Such an interpretation defeats the clear intent of bylaw 13 and shall not be adopted by this court.

It is only proper to permit the clear preference of the shareholders to rule on a proposal to change the control and management of their organization. Talbot's proxies were recent and expressed the current view of the savings and loan constituents as to the present management. Farley's proxies, on the other hand, were old, having been given two years prior to Blome, as president and a representative of management, by shareholders who could have had no idea the proxies would be used two years later to bring in a new group to control the association. The shareholders should have the right, as their bylaws correctly interpreted provide, to vote on who is to control the institution to which their savings are entrusted.

Because the Talbot proxies were votable, the motion to adjourn the February 22nd meeting to March 30th and to then vote on increasing the number of directors was defeated. This decision thus moots the issue of the negative votes and the election of Talbot and Laudeman. While William Evans gave his expert opinion that Roberts Rules of Order permits negative voting and hence Talbot and Laudeman were not elected on January 19, there is no need for the court to rule on this point. Even if Talbot and Laudeman were not elected at this meeting they would still be directors in view of the court's holding that the Talbot proxies were properly voted. The subsequent act of the board electing Laudeman to fill a vacancy (assuming one existed) and the lack of an elected replacement for Talbot establishes their directorships under the provisions of paragraph 5 of the charter.

The court's findings of fact and conclusions of law as required by Rule 52, F.R.Civ.P., are contained in this opinion.

Plaintiffs are not entitled to the relief they seek and judgment shall be entered for defendants.