[No. 40023.    En Banc.    September 3, 1970.]

WASHINGTON STATE LABOR COUNCIL, *Appellant*, v. FEDER-
ATED AMERICAN INSURANCE COMPANY *et al.*,
*Respondents.*\*

*Trethewey, Brink & Wilson* and *Joseph H. Trethewey,*
for appellant.

*Helsell, Paul, Fetterman, Todd & Hokanson, Russell V.
Hokanson,* and *T. Dennis George,* for respondents.

HAMILTON, J.—Appellant Washington State Labor Coun-
cil initiated this action in pursuit of a permanent injunction
enjoining respondents Federated American Insurance Com-
pany and its then officers, E. M. Weston, Wayne Murray,
and Andrew J. Zimmerman, from validating an election of
corporate directors conducted on March 21, 1967. Appellant

\*Reported in 474 P.2d 98.

contended that the election was null and void or, in the alternative, that appellant's candidates for the directorships were duly elected. At the conclusion of a hearing upon the merits, the trial court held that the challenged election was validly conducted and dismissed appellant's complaint. This appeal followed.

The Washington State Labor Council, a chartered federation of AFL-CIO Unions within the state of Washington (hereafter referred to as the council), is a stockholder in Federated American Insurance Company (hereafter referred to as the company). The company was organized in 1955 to operate in the casualty insurance field for the benefit of organized labor. The bylaws of the company provide for 21 directors. Nine of these directors were to be elected at the annual meeting of shareholders scheduled for March 21, 1967. Prior to the meeting, both the council and the company, through their respective officers, proposed a slate of candidates and solicited proxies from the shareholders.

The company's proxy solicitation accompanied the notice of the annual meeting and informed the shareholders that one of the principal purposes of the meeting was the election of directors, that each share of stock was entitled to one vote for each director to be elected, and that such votes could be cumulated and cast for one or more of the candidates so long as the number of votes so cast did not exceed the cumulative vote of the owned shares. The solicitation also listed all of the candidates, and indicated the nominees for whom the officers of the company designated in the proxies would vote. The solicitations did not, however, detail the strategy which the company's officers would use in casting a cumulative vote.

On March 20, 1967, the day before the annual meeting, Mr. Marvin L. Williams, secretary-treasurer of the council, met with the company's officers, Mr. Weston, chairman of the board, and Mr. Zimmerman, secretary, to generally discuss procedures for the forthcoming election. In the course of determining whether a quorum would be present or represented at the meeting, Mr. Williams informed Mr. Weston and Mr. Zimmerman that the council held approxi-

mately 35,000 proxy votes. Following this meeting the company's officers, although not yet certain of the total number of proxy votes they would have, considered the method by which they would cast their cumulative vote.

The meeting of March 21st was held in an auditorium separate from but in the same building occupied by the company's main offices, and was attended by some 350 to 400 shareholders. Prior to the commencement of balloting, company officers explained to the assembled shareholders the mechanics of cumulative voting and advised them that there were two slates of candidates. The council's president, Mr. Joseph H. Davis, then spoke from the floor in favor of the council's candidates. Thereafter, the balloting, by written ballot, was carried on somewhat informally, with the company's officers answering any questions concurrently propounded from the floor. As the voting proceeded, employees of the company collected completed ballots from the shareholders and placed them in an open cardboard box. Mr. Williams, on behalf of the council, either personally placed the council's ballot in the box or delivered it directly to Mr. Zimmerman as secretary of the company—the evidence in this respect being in conflict.

When the voting had apparently concluded, the chairman of the meeting, Mr. Weston, requested that any outstanding ballots be turned in, and advised the shareholders that tabulation of the votes would commence the next day with the results to be announced as soon as the canvass was completed. Mr. Zimmerman, Mr. Williams, and a company employee then carried the cardboard box containing the ballots from the auditorium to the company's offices where a lid for the box was obtained and, at Mr. Williams' request, the box was sealed with tape, initialed by Mr. Williams and Mr. Zimmerman, and locked in a filing cabinet. A short time later the shareholders' meeting was adjourned.

Following adjournment, Mr. Weston and Mr. Zimmerman repaired to the company offices. There they determined the total number of proxies held on behalf of the company—some of which had been received during the shareholders' meeting—filled out some personal ballots and,

with the telephonic concurrence of Mr. Murray, cast the company's proxy votes. Following their predetermined voting strategy, they cast 10 votes each for 4 candidates, 2 of whom had been nominated by both the company and the council, and the remainder of the cumulated votes for the 5 remaining candidates on the company's slate. They then placed the completed ballots in an envelope, sealed it, and attached it to the box containing the ballots collected from the shareholders at the meeting.

Canvassing of the votes commenced the next morning, March 22, 1967. At this time, the council's representative at the tabulation noted the envelope attached to the top of the cardboard box and when advised of its contents challenged the propriety of the company's votes. The audit of the votes was completed on March 29, 1967. The tally, including the company's votes, resulted in the election of the two candidates endorsed by both slates, two of the council's nominees, and five of the company's nominees. The company then notified the shareholders of this result. Had the company's votes been disqualified the council's entire slate of candidates would have been elected. This suit was then initiated by the council.

Based upon the evidence presented at the hearing on the merits, some of which was conflicting, the trial court in essence found as facts: (a) The company's proxy solicitation informed shareholders concerning cumulative voting rights, named all nominees for the nine directorships, and designated the nominees for which the company would vote with the proxies solicited; (b) the length of time the polls were to be kept open at the shareholders' meeting was not fixed by charter, bylaw or rule adopted at the meeting, and no formal announcement closing the polls was made at the meeting; (3) the meeting was adjourned with the announcement that ballot tabulation would commence the next day; (4) the company's officers had no effective opportunity to cast the company's ballots during the shareholders' meeting; (5) at the time the company's ballots were cast, the polls had not been closed by the officers with whom rested the determination as to when the polls should

be closed; and (6) when the company's ballots were cast, the officers casting them had no knowledge of the contents of the council's ballot. These findings of fact are not challenged on appeal, and, accordingly, they become the established facts for purposes of our review. *Seattle v. Schaffer,* 71 Wn.2d 600, 430 P.2d 183 (1967); *Lewis v. Scott,* 54 Wn.2d 851, 341 P.2d 488 (1959); ROA I-43.

From these findings, the trial court concluded that the company had complied with all legal requirements in acquiring and voting its proxies, and that all shares voted on behalf of the company were fairly, timely and validly cast. Judgment was thereupon entered validating the results of the election as announced by the company.

By its assignments of error, directed to the trial court's conclusions of law, the council advances two contentions, namely, that the company's proxy solicitations were void and that its balloting was untimely and invalid.

In support of its first contention, the council, in essence, argues that the failure of the company to incorporate into its proxy solicitations a resume of the method by which it proposed to exercise the cumulative voting right violated the provisions of RCW 48.08.090(3)(a) and Item 5(3), Schedule A, State Insurance Commissioner's Regulations Regarding Proxies, Order No. 246 (1965), which respectively provide:

> No person shall solicit a proxy, consent, or authorization in respect of any stock of such an insurer unless he furnishes the person so solicited with written information reasonably adequate as to
>
> (a) the material matters in regard to which the powers so solicited are proposed to be used, . . .

RCW 48.08.090(3)(a).

> If action is to be taken with respect to the election of directors and if the persons solicited have cumulative voting rights, make a statement that they have such rights and state briefly the conditions precedent to the exercise thereof.

Item 5(3), Schedule A, State Insurance Commissioner's Regulations Regarding Proxies, Order No. 246 (1965).

The theme of the council's argument in this respect is that the method, manner or strategy by which cumulative votes would be allocated and cast in a directors' election constitute "material matters" under RCW 48.08.090(3)(a) which must be furnished to the solicited shareholder, and a statement of which constitutes a "condition precedent" to the exercise of cumulative voting under Item 5(3), Schedule A, of the Insurance Commissioner's Regulations Regarding Proxies, Order No. 246 (1965). Otherwise, the council asserts, the proxies are void.

We cannot agree with the council's assertions in this regard.

In the instant case, the company's proxy solicitation informed the shareholders that the purpose of the meeting on March 21, 1967, was the election of nine directors, named all of the nominees, stated the candidates' union affiliations and stockholdings, designated the nominees for whom the company would cast solicited proxy votes, explained that each outstanding share of common stock was entitled to one vote for each director being elected which could be cast for one or more of the candidates so long as the number of votes cast did not exceed the cumulative vote of the shares owned, and stated the methods by which a proxy could be revoked. The proxy form which accompanied the solicitation, and which shareholders were asked to sign, authorized the designated company representatives to vote proxied shares "as fully and for the same number of votes and with the same effect" as could the proxy giver were he or she present at the meeting.

■ Insofar as the council's objections under RCW 48.08.090(3)(a) be concerned, we are satisfied the foregoing recitation of information furnished by the company's proxy solicitation constitutes all of the "material matters" contemplated by the statute. In this vein it is to be observed that the statute states the solicitor of a proxy should furnish "reasonably adequate" information concerning the "material matters in regard to which" the proxy is sought, not information about the method or manner in which proxy votes will ultimately be alloted and cast. It would,

indeed, be a strained interpretation of the statute, to the disadvantage of all concerned, to hold that parties engaged in a proxy contest were compelled by its general terms, at the expense of otherwise invalidating their vote, to spell out considerably in advance of an election meeting, and without knowledge of how many proxy votes they would ultimately have, precisely how they would finally allocate such votes among their nominees. We conclude, as did the trial court, that RCW 48.08.090(3)(a) was not breached by the company.

We reach the same result in connection with the council's argument that preelection announcement of prospective vote allocations constitutes a "condition precedent" to the exercise of cumulative voting rights within the contemplation of Item 5(3), Schedule A, of the Insurance Commissioner's Regulations Regarding Proxies, *supra*.

RCW 23.01.290(3) as it stood at the time of the election here involved, and as it stands now (RCW 23A.08.300),[1] insofar as here pertinent, imposes no qualifications upon the right of a shareholder, or his proxy, in a corporate directorship election to multiply the number of votes to which the shareholder is entitled by the number of directors to be elected and to cast all such votes for one candidate or distribute them among any two or more candidates. Neither does the company's bylaws impose any pertinent restrictions upon such a right. It is reasonable to assume

---

[1] RCW 23.01.290(3) provides:

"In the election of directors, every shareholder of record shall have the right to multiply the number of votes to which he may be entitled under subsection (1) of this section by the number of directors to be elected, and he may cast all such votes for one candidate or he may distribute them among any two or more candidates."

RCW 23A.08.300, effective July 1, 1967, provides, *inter alia:*

". . . Unless the articles of incorporation otherwise provide, at each election for directors every shareholder entitled to vote at such election shall have the right to vote in person or by proxy, the number of shares owned by him for as many persons as there are directors to be elected and for whose election he has a right to vote, or to cumulate his votes by giving one candidate as many votes as the number of such directors multiplied by the number of his shares shall equal, or by distributing such votes on the same principle among any number of such candidates."

that the Insurance Commissioner's regulation was designed to meet those situations where, either by statute or by authorized internal corporate regulation, some qualification or condition was placed upon the right of cumulative voting, *e.g.*, a requirement that a shareholder must give advance notice of his intention to exercise his cumulative voting right. Absent such statutory or authorized internal corporate restriction applicable here, there was no pertinent "conditions precedent," as that phrase is ordinarily understood, to the exercise of cumulative voting which the company was required to set forth in its proxy solicitations. *See generally* 5 W. Fletcher, Cyclopedia Corporations § 2048 (perm. ed. rev. 1967); E. Aranow & H. Einhorn, Proxy Contests for Corporate Control 195, 337 (1968). The company's proxy solicitations, therefore, did not violate Item 5(3), Schedule A, State Insurance Commissioner's Regulations Regarding Proxies, Order No. 246 (1965).

The council, by its second major contention, asserts that the polls for the directorship election were closed with the adjournment of the meeting and that the company's votes thereafter cast were untimely and invalid.

The trial court disagreed and so do we.

In the instant case, neither the applicable statute, the company bylaws, any preelection agreement, nor any definitive public announcement or determination at the meeting involved fixed a specific time when the polls would be deemed closed. RCW 23.01.280(3)[2] and the company's bylaws[3] provided that any meeting at which directors are to be elected can be adjourned only from day to day until

---

[2]RCW 23.01.280(3) provides:

"An adjournment or adjournments of any annual or special meeting may be taken without new notice being given, but any meeting at which directors are to be elected shall be adjourned only from day to day until such directors have been elected."

[3]Federated American Insurance Company bylaw, art. 3, § 8, provides:

"An adjournment or adjournments of any annual or special meeting may be taken without new notice being given, but any meeting at which directors are to be elected shall be adjourned only from day to day until such directors have been elected."

completion of the election. By its unchallenged findings of fact, the trial court determined that the company officers, because of their duties in conducting the meeting, were unable to effectively prepare and cast the company's ballots and that at the time they did cast those ballots, immediately after the adjournment and before any canvass of the votes had commenced, they were unaware of the manner in which the council had cast its vote. Implicit in the trial court's findings, and the council does not contend to the contrary, is the absence of any showing of fraud, bad faith or overreaching on the part of the company officers in allocating and casting the disputed votes at the time in question. And, it is evident from the number of outstanding shares eligible to vote, the number of proxies held by the council and the company, and the final number of proxies validated at the audit of the election, that the company's officers held a substantial number, if not in fact a majority, of the outstanding proxy votes.

Under the foregoing circumstances, we are convinced prevailing principles of law would not warrant nor justify disfranchisement and disqualification of the company's votes.

The right of a qualified shareholder in a corporation to vote, either personally or by proxy, for the directors who are to manage the corporate affairs is a valuable and vested property right. It is one of the most important rights incident to stock ownership and should not be annulled for purely technical reasons. *State ex rel. Swanson v. Perham,* 30 Wn.2d 368, 191 P.2d 689 (1948); *State ex rel. Johnson v. Heap,* 1 Wn.2d 316, 95 P.2d 1039 (1939); *State ex rel. Lidral v. Superior Court,* 198 Wash. 610, 89 P.2d 501 (1939).

In *State ex rel. David v. Dailey,* 23 Wn.2d 25, 158 P.2d 330 (1945), this court tacitly recognized the overriding significance of a stockholder's right to exercise, in good faith, the franchise of proxy votes held by him. In that case a stockholder was permitted to cast his vote and have it counted after the tabulation of the election results had commenced but before the final result had been formally announced.

Other jurisdictions and authorities reach the same result in similar circumstances. *Clopton v. Chandler,* 27 Cal. App. 595, 150 P. 1012 (1915); *Young v. Jebbett,* 213 App. Div. 774, 211 N.Y.S. 61 (1925); *Zachary v. Milin,* 294 Mich. 622, 293 N.W. 770 (1940); *State ex rel. Dunbar v. Hohmann,* 248 S.W.2d 49 (Mo. App. 1952); 5 W. Fletcher, Cyclopedia Corporations § 2017 (perm. ed. rev. 1967); E. Aranow & H. Einhorn, Proxy Contests for Corporate Control 366, 367 (1968).

■ The principle emerging from the cited authorities is that a shareholder, who through inadvertence, mistake, or other reasonable cause is unable to vote or is prevented from casting his vote or his proxy votes during the regular time of balloting, will not be precluded from voting after the balloting has closed and before the final results are officially announced; provided, such belated voting is not prohibited by statute, corporate bylaw, or other officially authorized and announced rules and is free of fraud, bad faith and/or overreaching.

Although the casting of the company's votes during the course of the meeting in the instant case conceivably might have been productive of greater shareholder harmony and satisfaction with the election results, we conclude that, under the circumstances here found prevailing and the applicable rules of law, the company's votes were, nevertheless, timely and validly cast.

The judgment of the trial court is affirmed.

FINLEY and HALE, JJ., and DONWORTH, J. Pro Tem., concur.

NEILL, J., concurs in the result.

HUNTER, C. J. (dissenting)—I dissent.

The question in this case is whether management with a major portion of the voting stock, which also conducts an election, may vote in a corporate election after the period for voting has ended and the meeting adjourned.

Washington State Labor Council, the plaintiff (appellant), sought a permanent injunction restraining Federated

American Insurance Company, the defendant (respondent), from validating a directors' election.

Nine of twenty-one directors were to be elected at the meeting in question. The defendants had enough votes and proxies to elect five of the nine directors. The day before the annual meeting, management (the defendant's officers) met and considered a plan as to how they would vote.

The following day the annual meeting was held. The purpose of the meeting, as announced in the management's notice sent to the stockholders, was:

for the purpose of
(1) Electing directors.
(2) Acting upon any and all other appropriate matters that may come before the meeting or any adjournments thereof.

At the meeting voting was by written ballot. The defendant's employees collected the ballots and placed them in a cardboard box.

After the voting was apparently completed, the chairman requested *any outstanding ballots be turned in* and informed the shareholders present that the ballots would be counted the following day with the results to be announced immediately after the count. The box was removed to the defendant's offices where it was sealed. The meeting was then adjourned.

After adjournment, two of the defendant's officers returned to their offices where they cast the management's votes and proxies. They then sealed these ballots in an envelope and attached it to the ballot box. The next morning, the plaintiffs first became aware of the voting irregularity and challenged the timeliness of those votes.

The plaintiff urges that the defendant's proxy solicitations were void and that the ballots were not timely cast and therefore invalid. I concur with the majority's disposition of the issue as to the validity of the proxy solicitations. However, I strongly dissent as to the majority's holding as to the validity of the ballots cast.

It is the majority's opinion that a vote cast after balloting has ceased but before the result has been officially announced, is permissible, provided that such irregularity is

free of fraud or bad faith and does not contravene statute, bylaw, or other announced rules.

Although the majority is correct in its holding that the right to vote in corporate elections is a strong right and one which should not be abrogated on mere technicalities, this holding is unrealistic in that it fails to consider the position and authority of the parties involved. This case does not involve a mere shareholder who has been prevented from timely casting his vote through inadvertence or mistake. On the contrary, this case concerns the corporation's officers and directors who controlled enough stock to safely elect five of nine directors to be elected at this meeting. Further, they were in charge of the meeting. Thus, management was in a very strong position to control the conduct of the meeting.

It is precisely because of such a position that the law imposes a fiduciary obligation on officers and directors to act with utmost good faith toward the corporation and its stockholders. *Central Bldg. Co. v. Keystone Shares Corp.,* 185 Wash. 645, 56 P.2d 697 (1936); *Wool Growers Serv. Corp. v. Simcoe Sheep Co.,* 18 Wn.2d 655, 140 P.2d 512, 141 P.2d 875 (1943); *Larson v. A. W. Larson Constr. Co.,* 36 Wn.2d 271, 217 P.2d 789 (1950); *Kane v. Klos,* 50 Wn.2d 778, 314 P.2d 672 (1957).

Insofar as the instant case is concerned, I am satisfied that there is no bad faith involved. However, the rule adopted by the majority places corporate management in a position whereby it can control and manipulate elections.

The high fiduciary duty which accompanies the office of corporate management was meant to check the possible abuse of power to which that position is susceptible. Yet, the majority has failed to observe this legal principle in its opinion.

The majority opinion states:

Implicit in the trial court's findings, . . . is the *absence of any showing of fraud, bad faith or overreaching* on the part of the company officers in allocating and casting the disputed votes at the time in question.

(Italics ours.) This statement and the tenor of the majority

opinion have established a rule that places the burden of proving fraud, bad faith, or overreaching on the party challenging the validity of the vote. It is abhorrent to judicial process that the question of bad faith should be determined by the testimony of those who have control of the evidence. The majority opinion by this rule ignores the situation that the party guilty of the irregularity is the party in control of the meeting, in control of a major portion of the voting stock, and in control of the evidence as to how the ballots are cast, thus affording it the opportunity to manipulate elections. The evidence of good faith is in the hands of management, and there is no way to delve into their minds to determine their motives in such situations.

Here, the purpose of the meeting was twofold—to elect directors and to act upon any and all matters that may come "before the meeting" or "any adjournments." It was also announced at the meeting that *any outstanding ballots be turned in.* The logical result of this is that all shareholders present at the meeting would believe that the balloting had ceased. This was demonstrated the following day when the plaintiffs were astonished to learn that management's votes had not been cast until after the adjournment, whereupon they questioned the validity of the ballots so cast.

The majority has cited as authority a line of cases which, in effect, state that a shareholder, who through inadvertence, mistake, or other reasonable cause has not timely cast his ballot, may vote even though the polls are closed, so long as the final results are not announced and there is no bad faith or fraud. These cases are not apropos. They are concerned with a mere shareholder who through inadvertence has arrived late. They do not concern a situation where management, who controls the meeting and a major portion of the voting stock, is guilty of a voting irregularity as in this case. To allow such a precedent to be established, as permitted by the majority, opens the door to deceptive practices and would be against public policy.

For the reasons above stated, I would invalidate the ballots irregularly cast.

ROSELLINI, J., concurs with HUNTER, C. J.