**DYNAMICS CORPORATION OF AMERICA, Plaintiff,**

v.

**CTS CORPORATION, Robert D. Hostetler, Gary B. Erekson, Joseph DiGirolamo, George F. Sommer, Gerald H. Frieling, Jr., Don J. Kacek, Ted Ross, and Richard M. Ringoen, Defendants.**

No. 86 C 1624.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 7, 1986.

Lowell E. Sachnoff, William N. Weaver, Jr., Dean A. Dickie, Sarah R. Wolff, Thomas J. Bamonte, Sachnoff Weaver & Rubenstein, Ltd., Chicago, Ill., for plaintiff Dynamics Corp.

Timothy A. Nelsen, Mark T. Carberry, Christina M. Tchen, Skadden, Arps, Slate, Meagher & Flom, Chicago, Ill., for Outside Director defendants Sommer, Frieling, Kacek, Ross & Ringoen.

Stephen Sandels, Gary Prior, McDermott Will & Emery, Chicago, Ill., for CTS Corp., Hostetler, DiGirolamo & Erekson.

### MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This action under the Securities Exchange Act, 15 U.S.C. § 78n(a), is before the court on the motion of plaintiff Dynamics Corporation of America ("DCA") for a preliminary injunction setting aside the election results of the May 16th annual

meeting of defendant CTS Corporation ("CTS.") Although many of the federal claims in this case are now moot or informally stayed, this court has independent jurisdiction based on diversity of citzenship and continuing pendent jurisdiction over the state law controversies by virtue of an earlier injunction entered on May 3, 1986. For the reasons set forth herein, the current motion is denied.

In the present motion, DCA seeks to have CTS order a recalculation of the election results due to legal and factual errors committed by the inspectors of the election. These errors, it is argued, caused the incumbent directors to be unlawfully and erroneously seated on the CTS Board for another term. Specifically, DCA raises six challenges to the election results: 1) the inspectors violated CTS bylaws by counting over 95,000 proxies received after the meeting was adjourned; 2) the inspectors violated Indiana law by counting over 272,000 telegraphic proxies, or datagrams; 3) certain proxies voted in favor of management actually related to shares earlier purchased by DCA; 4) certain proxies voted for management were based on instructions given to nominee holders during a period this court had ruled "tainted" due to misleading proxy materials; 5) the inspectors wrongly failed to count certain votes cast for DCA; and 6) the inspectors wrongly invalidated certain shares tendered to DCA because they mistakenly believed the letters of transmittal were ineffective absent formal proxy language.

### Facts

On March 10, 1986, plaintiff DCA, a 9.7% shareholder in CTS, commenced a partial tender offer and proxy contest as part of a strategy to elect its own slate of directors to the CTS Board at the annual meeting set for April 25, 1986. Following various legal developments in this court and the court of appeals, the CTS Board, under the direction of a Special Committee of Outside Directors, rescheduled the annual meeting to May 16, 1986, announced a decision to sell the company, and adopted a poison pill plan designed to permit the sale. On May 3, 1986, this court denied DCA's motion to enjoin the poison pill plan as a breach of fiduciary duty. That opinion is now being appealed.

On May 7, 1986, DCA publicly announced through a press release that it too would commit to a sale of CTS at the highest possible price within a reasonable period of time, and began numerous follow-up calls to large investors to inform them of its change in position. The Special Committee in response on May 12, 1986 took out a full-page ad in the *Wall Street Journal* to describe and comment on DCA's position. Similar half-page advertisements appeared in the May 13th and May 15th editions of the *Journal*. DCA sent no direct mailing to stockholders informing them of the change until May 12, 1986. Because the new proxy material was mailed rather than wired, it appears that beneficial or record holders who were not personally contacted by the proxy contestants and were not following the contest in the news may have learned of DCA's new position as late as May 15, 1986.

The annual meeting was held in Elkhart, Indiana on the morning of May 16, 1986. The meeting opened at 9:30 a.m. and adjourned thirteen minutes later at approximately 9:43 a.m. pending a count of the votes. CTS Chairman Richard Hostetler, who presided over the meeting, announced that the polls would remain open until 5:00 p.m. that day. His motives for this announcement are in dispute. According to affidavits filed with this court by both Hostetler and Richard Nye, a representative of CTS's proxy solicitor Georgeson & Co., Georgeson had advised Hostetler that keeping the polls open would increase the likelihood that all stockholders who wanted to vote would be able to do so, particularly stockholders who had not yet responded to the last minute solicitations by both sides. According to DCA, however, a different rationale was forwarded at the time and the polls were in fact kept open to aid

incumbent management.[1] Both Hostetler and Nye claim to have instructed their staffs to cease soliciting proxies after the meeting had begun. There is no evidence that those instructions were ignored.

Over the next week, the inspectors of the election, CT Corporation System ("CT" or "CT Corporation") (no relation to CTS) counted the votes. On May 23, 1986, CT released a preliminary vote count which indicated that the CTS slate of incumbent directors had prevailed. Following the release of this preliminary count, representatives of DCA, CTS, and the Special Committee met at the offices of CT Corporation in Wilmington, Delaware to engage in a four-day review of the election "results" and the inspectors' mode of calculation. On May 30, 1986, at the conclusion of the review, DCA raised the same objections it now raises here. The inspectors refused to modify their results on the ground that the challenges were more appropriately raised before a court than before them. According to the ordinary practice of CT Corporation, no transcript was maintained of the challenge session.

Following the conclusion of the challenge period, the election inspectors certified the results of the election and issued the Final Report of Inspectors of Election. The exact results of the final report, rounded to the nearest thousand, were as follows:

| | |
|---|---|
| CTS Outside Directors | 2,528,000 |
| CTS Inside Directors | 2,389,000 |
| DCA Nominees | 2,255,000 |

Needless to say, the narrow margin of victory—134,000 in the case of the three inside directors and 273,000 in the case of the outside directors out of 4,820,000 voting shares—demonstrates the significance of DCA's current challenges to the final outcome of the election.

Following the submission of the Election Report to CTS, the Annual Meeting was reconvened on June 2 and the incumbent directors were seated on the CTS Board for another term. At issue in the present motion is whether the alleged legal and computational errors so undermined the election as to require recalculation. DCA claims that correction of the errors would reveal that its slate, and not the CTS slate, received a plurality of the votes.

### Standards for Injunctive Relief

A preliminary injunction should issue upon the following showings: the movant must show 1) a probability of success on the merits; 2) that it has no adequate remedy at law and will suffer immediate and irreparable injury in the absence of an injunction; 3) that the harm to it of not granting an injunction outweighs the irreparable harm to the opposing party of granting such relief; and 4) that an injunction will not harm the public interest. *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 386–88 (7th Cir.1984). In a case such as the present one, however, where the harms are very difficult to quantify and might best be described as offsetting, the chief inquiry is which party is more likely to prevail at a full trial. *See Dynamics Corporation of America v. CTS Corp.,* 794 F.2d 250, 252 (7th Cir. 1986).

With these overall standards in mind, the court now turns to the specific challenges raised by DCA.

### Legal Discussion

A. *Disqualification of Post-Meeting Votes*

■ Sometime on May 15, 1986, or perhaps earlier, CTS management announced its intention to keep the election polls open for the full business day of the annual meeting. DCA objected. While the court denied the last minute objection, the court on its own motion ordered CTS to direct CT Corporation to segregate all late proxies for the purpose of determining whether this practice affected the election result. Segregation of these votes revealed that between 9:43 a.m. and 5:00 p.m. on May 16,

---

**1.** The former of these two assertions is made in a footnote at page 2 of DCA's reply brief, but is not supported by actual evidence. The court's acceptance of the allegation for purposes of discussion should not be taken as a finding of fact.

the CTS nominees received an additional 95,142 votes. Of these votes, approximately 91,000 were cast by Manufacturers Hanover Trust Company pursuant to instructions received from a beneficial holder at around 10:00 a.m. Eastern Daylight Time (9:00 a.m., Central Daylight Time), but which were not physically delivered and telecopied to the election inspectors until one hour later, after the meeting had adjourned.

DCA argues that all 95,142 of these votes were counted in violation of CTS's own bylaws, and therefore must be invalidated. The bylaw in question reads as follows:

> The stockholders may be represented at any meeting thereof by their duly appointed Attorney-in-Fact *provided* the proxy so appointing said Attorney-in-Fact shall be filed with the Secretary *prior* to the meeting.

CTS Bylaws, Art. VI, § 7 (emphasis added). According to the affidavit of Hostetler, however, since 1980 or earlier it has been CTS's policy and practice to accept proxies submitted at any time *during* an annual meeting of shareholders (Aff. ¶ 13). No provision in the bylaws specifies the permissible length of time for keeping the polls open, as opposed to the procedures for duly appointing an Attorney-in-Fact to represent a stockholder at an annual meeting.

The court notes initially that DCA's request to enjoin post-meeting votes does not automatically follow the bylaw it raises in support of its motion. The bylaw does not require the polls to be closed at any particular time, but simply requires shareholders voting by proxy to file those proxies with the company prior to the meeting. Thus, if the late votes came from shareholders who had already filed proxies earlier in the election, the authority of their representative to act for them would not be in question and the bylaw would in no way prevent them from changing their vote. *Cf. Zachary v. Milin,* 294 Mich. 622, 293 N.W. 770, 772 (1940) (stockholder allowed to change vote at any time during meeting before result is finally announced). Moreover, in the interest of fairness, the court would have to enjoin not only post-meeting votes but also all new proxies cast at the meeting itself. The present record is insufficient for making either of these determinations, and DCA's request is therefore in some sense premature.

The court notes secondly that DCA's request to sweep aside all late votes is without equity, since to do so would be to disenfranchise stockholders regardless of actual impropriety in the decision to delay the closing of the polls. In similar situations, courts have unanimously concluded that ballots cast after an annual meeting of stockholders but before the final results of an election are valid and should be counted. *Zierath Combination Drill Co. v. Croake,* 21 Cal.App. 222, 131 P. 335 (1913); *State ex rel. Dunbar v. Hohmann,* 248 S.W.2d 49, 51 (Mo.App.1952); *Young v. Jebbett,* 213 A.D. 774, 779, 211 N.Y.S. 61, 66 (1925); *Wells v. Beekman Terrace, Inc.,* 23 Misc.2d 22, 197 N.Y.S.2d 79, 82 (1960); *Salgo v. Matthews,* 497 S.W.2d 620, 630 (Tex. Ct.App.1973); *Washington State Labor Council v. Federated American Insurance Co.,* 78 Wash.2d 263, 273, 474 P.2d 98, 103 (1970).

DCA argues that the above cases are limited to the situation where the failure to cast a timely ballot was due to mistake or reasonable cause and where there is no corporate bylaw barring such votes. Particular reliance is placed on the following passage:

> The principle emerging from the cited authorities is that a shareholder, *who through inadvertence, mistake, or other reasonable cause* is unable to vote or is prevented from casting his vote or his proxy votes during the regular time of balloting, will not be precluded from voting after the balloting has closed and before the final results are officially announced; *provided, such belated voting is not prohibited by statute, corporate bylaw, or other officially authorized and announced rules* and is free of fraud, bad faith and/or overreaching.

*Washington State Labor Council*, 474 P.2d at 103 (emphasis added). Because CTS allegedly lacked "reasonable cause" for keeping the polls open and because its bylaws prohibit such late votes, DCA argues that the votes cannot be counted.

The court does not agree, at least for the purposes of preliminary relief. The cases make clear that a stockholder's right to vote for the board of directors is not only "a valuable and vested right" but "one of the most important rights incident to stock ownership" and should not be annulled for purely technical reasons. *Id.* In *Smith v. Koerber*, 352 F.Supp. 591 (D.Md.1972), *aff'd per curiam*, 479 F.2d 1043 (4th Cir. 1973), a corporate bylaw provided that, to be voted, proxies had to be filed five days before the date on which the meeting convened. The meeting in question was adjourned to be reconvened on a later date. Although Robert's Rules of Order indicated that the latter meeting was merely a continuation of the first, the district court found that proxies filed five days before the second meeting date were valid. In so interpreting the bylaw, the court stressed that the rule's purpose was "to permit the orderly recordation of proxies and not to disenfranchise shareholders desiring to vote on vital issues concerning the management of a savings and loan association." *Id.* at 595.

Other courts have similarly held that post-meeting proxies were validly counted on the ground that the election does not formally "close" until the results are announced, even though the meeting may be adjourned. *See State ex rel. David v. Dailey*, 23 Wash.2d 25, 158 P.2d 330, 331–32 (1945); *Salgo v. Matthews*, 497 S.W.2d 620, 630 (Tex.Ct.App.1973). The latter case, however, also noted the absence of a controlling bylaw as an additional ground for its decision. Thus, while the case law emphatically supports a stockholder's right to vote belatedly, in no case did the court rely on that right to override or ignore an otherwise binding statute or bylaw.

The bylaw at issue in this case unambiguously requires proxies to be filed *prior to* the stockholders' meeting. Under *Smith v. Koerber*, however, "meeting" would be interpreted to mean not necessarily the original date (May 16) but also the date on which the meeting was reconvened for purposes of announcing the preliminary results (May 23). Such an interpretation would promote the full enfranchisement of stockholders in accordance with the case law, and is more consistent with other provisions of the bylaws than is DCA's strict reading. Under Art. VI, § 4 of the bylaws, a stockholders' meeting at which less than a quorum is present shall be adjourned to a later date. Unless proxies filed prior to the second meeting counted toward the quorum, no meeting could resume absent personal appearances from the necessary missing stockholders. Thus, at least in this situation, the bylaws would appear to contemplate the filing of proxies after the literal commencement of a meeting. The court finds that the requirement of a pre-meeting filing can similarly be interpreted to allow for extended voting throughout the recess period. To conclude otherwise would exalt corporate technicality over substance.

The court also finds that the late votes should not be invalidated for failure to show cause. CTS has argued that DCA's late announcement constituted cause for keeping the polls open. The court agrees in part but is concerned over CTS's exaggerations in its brief on just how "last-minute" DCA's change in position was and DCA's charge of prior silence on this motive. Such factual matters need not be resolved on the present motion, however, since the cases do not require reasonable cause for the late filing of ballots. The authorities cited by the parties have looked to factors such as whether the late proxies were submitted in good faith and without prejudice to others instead of examining the stockholder's "cause" for not filing a timely ballot. In *Washington State Labor Council*, for example, the company's officers had sealed the ballot box at the meeting and adjourned for computation of votes without having counted up or voted the proxies they held. In upholding the votes,

the court noted that no formal announcement closing the polls had been made and that the officers didn't know how crucial the votes they were casting would be, 474 P.2d at 100–01, but ignored the fact that the directors readily could have counted their proxies before adjournment. Thus, the language about "inadvertence" and "mistake" does not suggest the sole grounds on which belated votes may be allowed; such terms are instead significant by contrast to the situation where a stockholder deliberately withholds his votes for tactical reasons.

In the instant case, not only was the decision to keep the polls open formally announced at the meeting but was known to DCA no later than the afternoon before. There is no present evidence that CTS secretly coordinated its proxy solicitations around the decision to keep the polls open before announcing that intention to DCA. DCA has also not on this record shown either that it was unfairly hampered in its last minute proxy solicitations by the decision or that CTS engaged in prohibited post-meeting solicitations. Significantly, nearly all of the post-adjournment votes were cast in one block before the meeting had convened, and were received after adjournment solely because of unavoidable delay in physically receiving and transmitting the proxy. Such belated voting fits within the "inadvertence or mistake" rationale of *Washington State Labor Council.* There is no evidence that Hostetler or Georgeson representatives were advised of this or other pro-management blocks of unvoted stock when they decided to keep the polls open all day. Their general belief that last minute developments favored their side would not necessarily suffice. Thus, at least on the present record, DCA has not shown a probability of success sufficient to justify invalidation of these votes altogether.

This court is concerned that the rule allowing belated voting should not give management a license to manipulate elections to its own advantage, *Washington State Labor Council,* 474 P.2d at 104–05 (dissenting opinion of Hunter, C.J.) and

that a fuller record might justify a different result. For example, DCA might upon full discovery successfully challenge the bona fides of CTS's claim that DCA's change in position nine days before the election and its last minute fight letter necessitated an extended voting period. Because any injunction on this issue would effectively grant DCA permanent relief and potentially override the votes of other CTS shareholders who thought they had cast valid proxies, however, the court cannot grant DCA's requests without a fuller record and a stronger showing of probable success on these claims.

B. *Disqualification of Votes Received by Telegraphic Proxies*

The election inspectors included within their final tallies votes cast by telegraphic proxies, or datagrams. The procedure used for voting such proxies was for the stockholder to 1) call an "800" number established by Western Union; 2) give the operator a name, address and phone number; and 3) express his or her voting preferences. Upon so doing, Western Union would then send a telegram at the recipient's expense identical in form to the proxy cards used by the contestants. According to the estimate of DCA's proxy solicitor, exclusion of the datagrams from the final vote count would give DCA a net gain of approximately 270,000 shares.

Under the newly enacted Indiana Business Corporation Law, which CTS opted into on March 27, 1986, a shareholder or his attorney-in-fact must implicitly *sign* a proxy authorization before the proxy will be effective:

(a) A shareholder may vote the shareholder's share in person or by proxy.

(b) A shareholder may appoint a proxy to vote or otherwise act for the shareholder by signing an appointment form, either personally or by the shareholder's attorney-in-fact.

Ind.Code. § 23–1–30–3. DCA argues that "signing" refers to manual signature, and does not include the placing of a sharehold-

er's name on a proxy form pursuant to telegraphic instruction.

■ The Indiana Business Corporation Act tracks the language of the ABA Model Business Corporation Act, and any legislative history of the Model Act may therefore be incorporated into an analysis of the Indiana statute. *Cf. In re Marriage of Hudson*, 434 N.E.2d 107, 113 (Ind.App. 1982), *cert. denied sub nom. Hudson v. Hudson*, 459 U.S. 1202, 103 S.Ct. 1187, 75 L.Ed.2d 433 (1983) (applying similar rule for statute based on legislation from sister state). The section in question follows § 7.22 of the Model Act. Contrary to the arguments of both parties, however, the statutory intent of that section is unclear. Since many states require only that a proxy be in writing, *see* Aranow & Einhorn, *Proxy Contests for Corporate Control* 415 (2d ed. 1968) (*"Proxy Contests"*), and since some states specifically authorize telegraphic proxies, *see, e.g.,* Cal.Corp.Code § 178 (West 1986), the Model Act's requirement of a "signing" may be intended to have a restrictive significance.

Such an interpretation, however, is at odds with the general tenor of the Model Act. The Official Comments to § 7.24 of the Model Act indicate that rubber stamped facsimile signatures are acceptable, and that unexecuted proxies can be counted in an election upon receipt of a confirmatory telegram from the shareholder. *See* 1 *Model Business Act Annotated,* § 7.22 at 609, § 7.24 at 625 (3d ed. 1985). The latter provisions do not automatically extend to the case at bar, since datagrams have a lesser degree of reliability than do facsimile signatures or confirmatory telegrams. Nonetheless, these provisions and the official comments to them indicate a presumption in favor of accepting any proxies which bear the marks of prima facie authenticity. Moreover, since an unexecuted proxy followed by a telegram indicating approval involves an "unsigned" proxy, the Act itself indicates that the signature requirements was not intended to be strictly enforced according to its terms.

Such flexibility in the interpretation of the signing requirement is borne out by the case law. In *Schott v. Climax Molybdenum Co.*, 38 Del. Ch. 450, 154 A.2d 221, 222–23 (1959), the Delaware Chancery Court turned to the common law of agency in determining whether a stamped or printed facsimile of a signature was presumptively valid in the corporate proxy-voting context. The court upheld the proxies as valid. In *Atterbury v. Consolidated Coppermines Corp.*, 26 Del. Ch. 1, 20 A.2d 743, 747 (1941), a case involving unmatched signatures, the court analyzed the issue from the presumption "that practicability must not be sacrificed to mere form, and that the use of proxies in corporate elections should not be hedged about by restrictions which, because of practical considerations, are almost prohibitive." Writing in 1968 on the subject, Aranow and Einhorn praised the use of telegrams in proxy contests since they were often the only way to revoke proxies based on last minute developments. *Proxy Contests, supra,* at 416. Plaintiffs contend, however, that datagrams lack the indicia of reliability which the above courts found necessary for presumptive authenticity.

Whether signature requirements represent an impractical and prohibitive restriction to be ignored or a crucial tool for assuring the reliability of proxies cannot be determined on this record. In particular, the court would like to know whether the datagrams led to any unauthorized votes in this contest. (At present, there is no such evidence.) Even were this court to prohibit datagrams solely as a statutory matter, the injunctive relief requested by DCA would be inappropriate. Both DCA and CTS solicited votes by datagrams, and while DCA contends that it did so only in response to CTS's solicitations, its failure to raise the issue prior to the election raises serious estoppel problems. *See Vogtman v. Merchants' Mortgage & Credit Co.,* 20 Del. Ch. 364, 178 A. 99, 103–04 (1935) (shareholder may not challenge legality of an election on ground of illegal votes when objection could have been raised before the election).

This estoppel defense precludes a likelihood of success on this claim.

Similarly, if the invalidation of datagrams were to disenfranchise many stockholders who had no reason to doubt the validity of their votes, the proper remedy would be a new election and not the automatic disqualification of these ballots. *Application of Garrett*, 132 N.Y.S.2d 373, 375 (Sup.Ct.1954). DCA does not request such relief, and the court will not order a new election on technical grounds absent some evidence that the shareholders executing datagram proxies would otherwise not have voted at all or have voted differently. *See Burke v. Wiswall*, 193 Misc. 14, 85 N.Y.S.2d 187, 191 (Sup.Ct.1948) (new election should not be ordered to correct a grievance unless result might thereby be changed).

### C. *DCA's Remaining Arguments*

DCA's remaining challenges to the election are factual rather than legal. Many of these challenges stem from the confusion created when a particular account both tendered its shares to DCA and submitted a proxy card for the full position. DCA specifically claims that 45,000 votes in its favor were not counted, and that 16,057 votes in CTS's favor were improperly counted due to inadequacies in the election procedure. DCA further contends that the election results were flawed because the inspectors did not properly determine whether all proxies voted during the "tainted" period of misleading disclosures from the CTS board were excluded.

The court denies relief on these grounds, not because it views the claims as lacking merit, but because the chief effect of injunctive relief at this point would simply be to order CTS, at its own expense presum-

ably, to conduct DCA's discovery. In other words, even if DCA is correct in its claim that the vote tally overstates CTS's margin by 61,057 votes, this figure is itself inconsequential, and it is speculative whether similar mistakes were made so as to cause a miscount of over 134,000 votes, such as would change the election results.[2] Injunctive relief is therefore inappropriate.

DCA's argument about the "tainted" proxy issue is similarly premature. On May 7, this court enjoined CTS from voting or otherwise using any proxies dated on or received during the period April 24 to May 7, 1986. The court also ordered CTS to notify the nominee holders of CTS stock to ignore pro-management proxies or instructions received during that period. In conducting their review of the election, the inspectors excluded pro-CTS proxies where the actual date fell within the tainted period, but did not inquire of nominee holders whether proxies sent after May 7 were based on instructions from beneficial holders sent during that same period. Since this court's order did not require CT Corporation to make such inquiries, DCA's belated attempt to expand the scope of relief it previously requested will not be granted. This ruling in no way, however, prevents DCA from conducting discovery itself to determine whether tainted instructions were in fact improperly counted and thereby to obtain permanent injunctive relief on a fuller record. At that time, of course, the court would be able to determine whether recalculation or a new election is the appropriate relief.

### Conclusion

For the reasons stated herein, the court concludes that DCA's legal objections to the election results do not provide a basis for changing the election results prelimi-

---

**2.** CTS has defended the various calculational errors by reference to the rule that election inspectors must confine their duties to clerical corrections evident from the face of the proxies themselves. *Williams v. Sterling Oil of Oklahoma, Inc.*, 273 A.2d 264, 265 (Del.1971). As DCA points out in reply, however, *Williams* concerns the ministerial role of the inspectors, and in no way circumscribes the authority of this

court. In other words, *Williams* suggests that CT Corporation acted properly in not correcting certain errors on its own initiative, and may even support the court in denying DCA's challenges on the proxies lacking proper appointment language, but does not block this court from ordering corrections or a new election upon the proper factual showing.

narily, and that injunctive relief regarding factual inaccuracies or "tainted" proxies can only be granted on a fuller record and on a showing that the election results were affected. Accordingly, the motion for preliminary injunctive relief on the sixth amended complaint is denied.

It is so ordered.