OPINION OF THE COURT
Howard Miller, J.
The motion is denied and the cross motion granted. Defendant may enter judgment against plaintiff dismissing the complaint with costs and disbursements.
The facts are relatively undisputed. On April 6, 1994 defendant mailed proxy materials to its shareholders preparatory to the annual meeting scheduled for May 11, 1994. Of the three proposals to be voted on at the meeting was one to remove plaintiff as a director for cause. Corporate bylaws require an affirmative vote of at least 80% of the combined voting power of all outstanding stock of all classes to remove a director. On May 11, 1994, 89.6% of the common stock outstanding and entitled to vote was represented at the meeting. After the votes were tallied, the chairman of the meeting closed the polls on two proposals and announced: "The polls will remain open on the proposal to remove James F. Smith as a Director, for cause. Votes are still being received and we want to give all shareholders the opportunity to vote on this important proposal.” The chairman then stated the meeting would be adjourned to June 10, 1994 and asked for a report on the voting. The secretary of the meeting responded, inter alia: "The preliminary results of the vote taken at the meeting are as follows: * * * With regard to the removal of Mr. Smith: to date, approximately 97.7% of the votes cast have voted in favor of Mr. Smith’s removal. These shares represent 75.9% of the outstanding shares of the company entitled to vote. And as we’ve noted before, 80% is required for the adoption of that particular proposal.”
*608 On May 18, 1994 defendant sent another notice to its shareholders advising them of the adjourned meeting and urging the shareholders to vote to remove plaintiff. On June 10, 1994, 90% of the voting shares were represented at the adjourned meeting. After closing the polls, the chairman announced that 82.5% of the outstanding shares had voted to remove plaintiff.
Plaintiff contends that his removal was improper and illegal in that (1) the polls were closed on two resolutions but remained open on the proposal to remove plaintiff; (2) the announcement of the preliminary results was "tantamount” to closing the polls, thus precluding the receipt of any further votes or consideration of the matter again at the adjourned meeting.
In considering the validity of corporate elections, "[f]undamental principles of corporate governance must be balanced and reconciled in any action brought to review an election of directors * * * The stockholders’ 'franchise is the ideological underpinning upon which the legitimacy of directorial power rests.’ ” (Concord Fin. Group v Tri-State Motor Tr. Co., 567 A2d 1 [Del 1989], citing Blasius Indus. v Atlas Corp., 564 A2d 651, 659 [Del Ch 1988].) The conduct of elections of directors is controlled largely by accepted usage and common practice, subject to fundamental principles of fairness and good faith (18A Am Jur 2d, Corporations, § 986; see also, Dozier v Automobile Club, 69 Mich App 114, 244 NW2d 376). Corporate elections are business affairs, not controlled by the strictures of special statutes affecting general elections, and should be conducted in such a manner as to afford all shareholders the fullest liberty in expressing their wishes (Zierath Combination Drill Co. v Croake, 21 Cal App 222, 131 P 335). The right of a shareholder to vote for directors who are to manage the corporate affairs is a "valuable and vested property right” representing one of the most important rights incident to stock ownership and should not be annulled for purely technical reasons (Smith v Koerber, 352 F Supp 591, 595; Dynamics Corp. v CTS Corp., 643 F Supp 215; Washington State Labor Council v Federated Am. Ins. Co., 78 Wash 2d 263, 273, 474 P2d 98).
While the foregoing cases establish governing legal principles applicable to the election of directors, no less important to a shareholder is the right to vote on a proposal to remove a director for cause, particularly where, as here, the director *609 has been indicted by a Grand Jury on charges of grand larceny directly stemming from his activities as a director.
In support of its cross motion for summary judgment, defendant contends that the election procedure at issue comports with common practice and accepted usage and submits the affidavit of Ronald E. Knox, Esq. Mr. Knox is employed by Morrow and Co., Inc., which has been engaged in the business of representing companies with respect to the solicitation of proxies on behalf of shareholders or company management for over 20 years. Mr. Knox alleges that "it is not uncommon for a meeting to be adjourned when an unusually high vote, in this case 80% of the outstanding shares, is required and not yet achieved,” and goes on to cite examples of eight other companies who have adjourned a meeting to allow for additional voting on certain proposals. Nathan Hill, assistant vice-president at Chemical Bank, defendant’s transfer agent for 15 years, submits an affidavit confirming this corporate practice. Neither affidavit is contradicted by plaintiff. Independently supporting the recognition of such a practice is an observation in 18A Am Jur 2d, Corporations, § 999 (at 850) which notes: "When a proposal fails due to an insufficient number of votes having been cast, the corporation must adjourn the meeting and send out a new notice to shareholders at additional expense and loss of time.”
The court finds that adjourning the meeting in order to give all shareholders the opportunity to vote on the proposal to remove plaintiff was not prohibited either by statute or bylaw, and is an accepted practice in the industry (see, e.g., Business Corporation Law § 605 [b]; Wells v Beekman Terrace, 23 Misc 2d 22, 24, citing Matter of Young v Jebbett, 213 App Div 774, 779; Fletcher’s Cyclopedia Corporations § 2017 [Perm ed]; 3 Cook, Corporations, at 2111 [8th ed]).
That the polls were closed on two other proposals, but not on the proposal to remove plaintiff, is neither surprising nor relevant, since the latter required not only a substantially higher vote, but was the only proposal to require an actual vote to be counted for approval. Plaintiff offers no evidentiary basis for his conclusion that closing the voting on two proposals, and continuing the voting on one, represented an illegal and improper act.
Nor does the record before the court support plaintiff’s contention that the secretary’s announcement of the "preliminary results” — having been prefaced by the chairman’s an *610 nouncement that "the polls will remain open * * * votes are still being received” — was tantamount to closing the polls. No election can be declared closed until the presiding officer has so announced (Zachary v Milin, 294 Mich 622, 293 NW 770) even though the meeting may be adjourned (Dynamics Corp. v CTS Corp., supra, at 219, citing State ex rel. David v Dailey, 23 Wash 2d 25, 158 P2d 330; Salgo v Matthews, 497 SW2d 620). In the absence of a controlling statute or bylaw, whether the polls are kept open is a matter within the discretion of the inspectors of election (18A Am Jur 2d, Corporations, § 999, at 850), who may keep the polls open beyond the specified hour (19 CJS, Corporations, § 440, at 42; see also, Matter of Chenango County Mut. Ins. Co., 19 Wend 635).
In denying plaintiff’s application for a temporary restraining order, this court held that when not prohibited by statute, corporate bylaw, or other officially authorized and announced rules, votes may be received after balloting has closed and before the final results are officially announced (Dynamics Corp. v CTS Corp., supra; Washington State Labor Council v Federated Am. Ins. Co., supra; State ex rel. Dunbar v Hohmann, 248 SW2d 49, 51 [Mo App 1952]; Matter of Young v Jebbett, 213 App Div 774, 779 [1925], supra; Wells v Beekman Terrace, supra; Salgo v Matthews, 497 SW2d 620, 630 [Tex Civ App 1973], supra). Votes cannot, however, be added after the polls have closed and the results formally announced (State ex rel. David v Dailey, supra), although in one instance, a closed poll has been reopened to receive votes. Nevertheless, the reopening of the poll in that case was considered an irregularity which did not warrant the setting aside of the election (Hardenburgh v Farmers & Mechanics’ Bank, 3 NJ Eq 68).
As observed in Dynamics Corp. v CTS Corp. (supra), "to sweep aside all late votes is without equity, since to do so would be to disenfranchise stockholders regardless of actual impropriety in the decision to delay the closing of the polls” (at 218). While the post-meeting solicitation in the May 18, 1994 notice to shareholders may conceivably rise to the level of impropriety, it is not sufficient to disenfranchise the votes cast prior to the closing of the polls. In the absence of a controlling bylaw, agreement or other binding provision concerning earlier closings of polls, stockholders have the right to change their votes so long as the final result has not been announced (Salgo v Matthews, supra).
The court has also considered that the requirement of attaining an 80% shareholders’ vote for removal of a director *611 for cause, in the case of a public utility, may be violative of public policy and unenforceable.
In recognition of the unique attributes of public utilities, the Legislature has strictly regulated this form of corporate enterprise, and provided for oversight by the Public Service Commission. The Commission was established for the paramount purpose of protecting and enforcing the rights of the public with regard to public utilities (People v Public Serv. Commit., 157 App Div 156) and is charged with reviewing the costs of utilities which should be borne by ratepayers (Rochester Gas & Elec. Corp. v Public Serv. Commn., 51 NY2d 823, appeal dismissed 450 US 961). By employing the supramajority provisions allowed by Business Corporation Law § 616 to establish an 80% vote to remove a director for cause, the utility has created a costly, Herculean bar to removal. Compounding this impolitic requirement, the enactment in 1987 of the bylaw requiring the 80% vote for removal was coupled with a provision requiring an 80% vote to change that very bylaw. The realities of obtaining an 80% vote of 13,532,446 outstanding shares were not lost on the shareholders, whose comments at the shareholders’ meetings evince a clear dissatisfaction with the 80% vote requirement. In response to a specific shareholder inquiry, defendant acknowledged that the original cost for the mailing of proxies was $320,000; although the figure for the second mailing was not provided, it can be readily assumed the cost was at least equal. These costs, combined with the acknowledged $9 million spent through the first quarter of 1994 for the investigation into the plaintiff’s alleged wrongdoing, impose an unconscionable burden upon the shareholders and will undoubtedly redound to the ratepayers in one form or the other.
It has long been acknowledged that the supramajority provisions are a "way around the rule” that shareholders may not be deprived of their right to discharge a director for cause, notwithstanding a contractual obligation to continue the director in office (Matter of Burkin [Katz], 1 NY2d 570; Fells v Katz, 256 NY 67; Dubin v Muchnick, 108 Misc 2d 1042, mod on other grounds 87 AD2d 508). It is unconscionable that a public utility may skirt the rule by requiring millions of shares to be voted to remove a director for cause. Clearly any agreement among shareholders which would preclude the discharge of an unfaithful employee of the corporation is illegal as against public policy (Fells v Katz, supra). It is no less so when a director allegedly fails to fulfill his fiduciary *612 duty to the shareholders and the sheer breadth of the voting requirement erects an almost insurmountable bar to removal.
The fact that defendant was able to obtain an 80% vote in this case does not militate against a finding that the 80% vote required to remove the director of a public utility is a violation of public policy. It is, rather, an indication that the serious nature of the extensively publicized allegations against plaintiff were sufficient to arouse more than 90% of the shareholders, albeit at a great expenditure of time and money to the corporation. While such voting is sanctioned by Business Corporation Law § 616, the Legislature should examine its availability to a public utility in the light of what has transpired in this case.